In re the PATERNITY OF D.A.B., by his next friend D.A.B., Natural Father.

D.A.B., Natural Father, Respondent,

v.

J.L.B., Natural Mother, Appellant.

No. WD 50127.

Missouri Court of Appeals, Western District.

June 27, 1995.

349

Ellen P. Aisenbrey, Kansas City, for appellant.

Robert E. Harris, Jeffery A. Hanna, Warrensburg, for respondent.

Before HANNA, P.J., and BERREY and SPINDEN, JJ.

BERREY, Judge.

J.L.B., the natural mother of D.A.B., appeals the trial court's transfer of custody of her 16–month–old son from J.L.B. to D.A.B., the natural father (hereinafter "D.B.").

The appellant cites two points of trial court error. She first contends the trial court erred in transferring physical custody of

D.A.B. from his mother to his father because there is no substantial evidence in the record to support the trial court's findings relative thereto. Appellant next argues that the trial court erred in transferring physical custody because the natural father had previously consented to the natural mother having custody and therefore failed to prove a change in circumstances, or that the transfer was in the best interest of the child. After a careful review of the whole record, we affirm the judgment of the trial court.

The record presents a sad commentary on the pernicious attitudes of humans as they battle each other for the custody of a minor son born out of wedlock when the mother and father were only 17 years of age. Of the many options discussed by the natural mother when she learned she was pregnant, marriage to the natural father was not one of them.

This matter began as a petition in juvenile court for transfer of custody and adoption of the minor child, D.A.B., born March 24, 1993. At that time, the natural parents were 17 years of age and unmarried. Both were living with their respective parents. On April 13, 1993, less than one month after the child's birth, both the natural mother and the natural father signed written consents to the adoption of D.A.B. by the maternal grandparents who filed their "Petition for Transfer of Custody and Adoption" on the same day.

On September 30, 1993, the natural father filed a "Petition for Determination of Father–Child Relationship, Order of Child Visitation and Child Support" as a separate action in circuit court. Then, on October 14, 1993, the natural father filed a motion for revocation of his consent to the adoption. The two cases were consolidated for trial purposes. After hearings on December 19, 1993, and January 18, 1994, the trial court granted the natural father's motion for revocation of consent. The maternal grandparents initial appeal of that order was subsequently dismissed.

On or about February 1, 1994, the natural mother moved with her parents and D.A.B. to California.[1] On February 16, 1994, the

natural father filed a "Motion for Leave to File an Amended Petition" in which he asked for physical custody of D.A.B. The court granted the natural father's motion on February 28, 1994. After another evidentiary hearing on July 19, 1994, the trial court, by its Judgment Entry of September 8, 1994, found that D.B. is the natural father of D.A.B. and that the best interests of the child would be served by transferring custody of D.A.B. to the natural father. From this judgment, the natural mother appeals.

The transcript is rife with condemnations and accusations on both sides. The trial court sorted it out and judged the credibility of the witnesses as was its duty. We are mindful that our review is guided by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will sustain the judgment of the trial court unless the trial court erroneously declares or applies the law, there is no substantial evidence to support the judgment, or unless it is against the weight of the evidence. Our deference to the trial court's judgment may be overcome if an abuse of discretion is demonstrated. *Dardick v. Dardick*, 670 S.W.2d 865, 868 (Mo. banc 1984).

In her first point, the natural mother claims that no substantial evidence exists to support the findings upon which the trial court based its judgment. She briefly makes an alternative suggestion that such findings are against the weight of the evidence. She takes exception to the court's findings that 1) the natural mother is at this time "unwilling or unable to take on the responsibility for holding a job or taking care of the child"; 2) "the actions of the maternal grandparents clearly show an intent to destroy the relationship of [D.A.B.] with the father"; and 3) "the natural mother and her parents' actions to prevent the natural father from forming a normal relationship with the child" prevent a placement with the mother. The natural mother does not take exception to the finding that D.B. is the natural father of D.A.B., and, in fact, she admitted that finding in her pleadings and testimony.

To dispute the trial court's finding that she is unable or unwilling to assume responsible

---

1. The maternal grandfather is a member of the Armed Forces.

care of D.A.B., the natural mother focuses on her recent conduct—i.e., conduct occurring since January 1994 and after she and the maternal grandparents realized the natural father was strongly seeking normal relations with D.A.B. The natural mother's brief and testimony admits the maternal grandmother provided the "majority of care" for D.A.B. for the first nine months of the child's life. Yet, she directs our attention only to conduct occurring since January 1994. She states that she is not only willing and able to care for the child, but that she has in fact devoted herself to his care "for the 6 months preceeding [sic] the July [1994] hearing."

However, the natural mother does not refute nor even address the substantial evidence that supports the trial court's finding. For example, she does not dispute the trial court's reasoning that the natural father has *consistently* taken a course which he thought to be in the best interest of the child. Nor does she refute the admission contained in her answer to the natural father's petition that she is "without adequate funds to provide for [D.A.B.'s] care, welfare and maintenance ..." The court had the benefit of the natural mother's own testimony wherein she stated that she is unable to give D.A.B. what he adequately needs when it also considered the maternal grandparents' admission in their first amended petition for adoption that the natural mother remains "wholly dependent" upon them for her "housing and sustenance." In addition, the court heard evidence that the natural mother had no problem with her parents making all of the decisions regarding the rearing of D.A.B. and that she was not opposed to becoming D.A.B.'s "sister." It also heard evidence that the natural mother freely, voluntarily and with full knowledge of the circumstances executed her consent to adoption of D.A.B. by her parents. The natural mother initially testified that she felt her parents could properly rear D.A.B. and she did not want D.A.B. reared 50% by one parent and 50% by the other.

Against all of the testimony the natural mother would emphasize, the trial court heard evidence that the natural father was a sophomore in college with 29 credit hours

behind him. He also was regularly employed as a night manager at a local grocery store earning $5.35 per hour for a 30–hour work week. There was evidence that the natural mother had been unable to retain employment in the past. She once worked 30 days at a restaurant chain and then quit, and on another occasion she worked only one day before quitting.

The natural father testified about the living conditions and day care arrangements he would provide for D.A.B. if granted custody. He planned to continue college if granted custody, attending classes from 8:00 a.m. to 11:00 a.m. the following fall semester. His employment hours were 5:00 p.m. to 11:00 p.m. four—five nights per week. The natural father stated that he had day care arrangements established at $2.50 per hour while he attends college classes. He stated that he would pick D.A.B. up from day care following his morning classes and spend the day with him until he leaves for work at 5:00 p.m. While the natural father is at work, the paternal grandmother would care for D.A.B. The natural father further stated that he would continue to live with his mother and stepfather in their three bedroom, two bath home. Photographs of the home were provided to the trial court. The natural father stated that he has a good relationship with both his mother and his stepfather with whom he has lived since he was eight years of age.

The paternal grandmother's testimony focused on her concerns about D.A.B. being reared by the natural mother or the maternal grandmother because of "[t]heir mental and emotional instability and [the natural mother having] no direction with her life." She felt that the natural mother is "very immature." The paternal grandmother knew the maternal grandmother was confined to bedrest for two—six weeks shortly after D.A.B.'s birth. During this period of bedrest, the natural father was visiting D.A.B. every day at the maternal grandparents' home. He explained that the maternal grandmother was unable to bear additional children of her own although he had heard the maternal grandparents discuss desires for a large family. The natural mother testified, however, that her mother's

bedrest was the result of anemia and dehydration. In any event, there was testimony that the natural mother did not get along well with her mother and sought counseling with her parents sometime after she began dating the natural father.

The natural mother was on welfare in California at the time of trial receiving $490.00 per month. She testified her parents were paying her legal fees although she intends to repay them. She pays for her car insurance and gas and bottled water for D.A.B. She buys D.A.B.'s food at the commissary.

In contending that no substantial evidence exists to support the trial court's findings that the actions of both the maternal grandparents and the natural mother clearly show an intent to destroy the relationship of D.A.B. with the father, the natural mother states:

> In light of the ambiguity in the legal rights of [D.B.] before he filed his Motion for Revocation, the trial court erred in finding that the five week denial of visitation to [D.B.] before October 22, 1994 should be held against both the prospective adoptive parents and the natural mother in the subsequent custody battle.

As is to be expected, the natural mother points to instances of her and her parents' cooperation in allowing the natural father visitation. She notes that the maternal grandparents permitted D.B. to visit the child at their house on a daily basis until July 1993, at which time they asked him not to come over as much. However, the natural mother again ignores additional and substantial evidence which otherwise supports the trial court's judgment.

For example, in July 1993, the maternal grandparents limited the natural father's visits with D.A.B. to three days per week; then they restricted him to only three hours per week. At the same time, the maternal grandparents began plans to move to California. They also realized in July 1993 that the natural father would not accept their offer to go with them to California and that he was concerned about what the move would mean to his visitation. Eventually, the maternal grandparents and the natural mother denied the natural father visitation with D.A.B. from September 17, 1993, through October 2, 1993, when he was allowed an hour and a half visitation. In September 1993, the natural mother told the natural father that he "had no rights" to see D.A.B., and the maternal grandparents asked him not to come around their home.

Further testimony by the natural father suggested that the maternal grandparents fabricated some of D.A.B.'s claimed medical problems in an effort to secure his consent to their adoption of D.A.B. When the child was approximately three weeks old, the maternal grandmother claims he stopped breathing while she was changing his diaper. An apnea monitor was leased, and the natural father paid one-half of the costs. Then, in August 1993, when the child was approximately four months old, the natural mother claims he suffered a seizure-like episode. The natural father questioned whether D.A.B. had in fact suffered an apnea or seizure spell, but when he was allowed to go with D.A.B. and the maternal grandmother to the doctor's office, the maternal grandmother did all the talking. The natural mother took D.A.B. to the hospital three weeks after the alleged August 1993 seizure and did not tell the doctors that the child's body turned blue. However, several months later and after moving to California, the natural mother reported to a doctor there that the child had turned blue in color.

After the first apnea spell three weeks after the child's birth, the natural father was told by the maternal grandparents that D.A.B. had a serious medical condition that would be quite costly. At that time, neither the natural mother nor the natural father had medical insurance to cover D.A.B. The maternal grandparents suggested D.A.B. could receive free medical care through the maternal grandfather's military benefits if D.A.B. became their dependent. They proposed that the natural father sign a "preadoption agreement" to effectuate such free benefits. A few days later, they drove the natural father to their attorney's office where he signed the consent to their adoption. While at the attorney's office, the natural father did not ask any questions or read the form.

In July 1993, as the natural father's relationship with the maternal grandparents and natural mother was breaking down, the maternal grandmother told the natural father that she and her husband were not going to go through with the preadoption. Thereafter, on July 27, 1993, the maternal grandparents and the natural mother took D.A.B. off base to a civilian doctor. On the medical history portion of this doctor's record, the answer to the question of whether D.A.B. ever suffered from convulsions was marked "no." The maternal grandmother presented the natural father with the doctor's bill and asked him to pay one-half. The maternal grandmother testified the first civilian doctor was "creepy" so she took D.A.B. off base to another civilian doctor. She then presented the natural father with this medical bill and asked him to pay one-half. Her claimed reason for taking D.A.B. to off-base doctors was to obtain a second opinion regarding the apnea. Eventually, D.A.B. was taken to the Children's Mercy Hospital where his tests results were found to be normal. However, based upon the natural mother's verbal description of the child's problems, the Children's Mercy doctor diagnosed D.A.B. with possible infantile epilepsy but did not recommend nor prescribe medicine. Subsequently, after moving to California, the natural mother took D.A.B. to another doctor who prescribed epilepsy medicine for the child based upon the natural mother's verbal description of his symptoms. This doctor discussed the side effects of such medicine with the natural mother. After the natural father questioned the natural mother about the propriety of giving the child medicine when all test results proved normal, the natural mother told him he "wouldn't be able to see [D.A.B.] until the Court made her."

Although the natural mother asserts "undisputed" evidence demonstrates that the move by the maternal grandparents to California was pursuant to military orders, the motive was in fact disputed. The maternal grandfather told the natural father in July 1993 that he, the maternal grandfather, could put in a request for orders to go to California. Additionally, Bobby Haas, a young boy who worked at the high school library where the natural mother attended, was subpoenaed to testify on behalf of the natural father. He testified regarding a conversation he had with the natural mother as she was preparing to leave the high school and move to California. According to Haas, the natural mother said she was glad to be leaving Missouri "to get away from [the natural father]." Haas testified that the natural mother explained she wanted to get away from the natural father because "he was bugging her about [D.A.B.] She—he wanted to get custody of [D.A.B.]"

The paternal grandmother of D.A.B. testified that she and her husband had met with the young parents of D.A.B. and the maternal grandparents prior to the child's birth. The maternal grandfather dominated the conversation. He announced "we have decided to have the baby." Everyone present understood the "we" referred to the maternal grandparents. The paternal grandmother also testified that the maternal grandfather told the natural father that "... he [the natural father] could be in or out or it was going to be his [the maternal grandfather's] way or [the natural father] could be out on the highway, and he would never see the child." In order to be "in," it would be necessary for the natural father to "do everything that [the maternal grandfather] said." The maternal grandfather essentially told the paternal grandmother that if she did not assist financially she "would not see the child."

The paternal grandmother acknowledged she felt the natural mother wanted a relationship with the natural father and D.A.B. but that the maternal grandparents were interfering with this desire. She further noted that although she had visited in the home of the maternal grandparents, she felt that the maternal grandparents did not want her there.

Judy Elsberry, a relative of the natural father who tried to intervene and open communication between all parties, testified that the maternal grandmother stated she and her husband did not think the kids should be parents. According to Ms. Elsberry, the maternal grandmother stated that the failed communication between the natural mother

and father "is the very reason that [the maternal grandfather] and I don't think that [the natural father] and [the natural mother] should be parents because they can't work this thing out." From Elsberry's testimony we conclude that, in addition to other problems, the maternal grandparents encouraged the natural mother to file statutory rape charges against the natural father. The maternal grandmother corrected Elsberry and said no, "It was sexual assault." According to Elsberry, the maternal grandmother also stated that if the natural father had not retained counsel "... this wouldn't be happening" and that the natural father "... would be seeing [D.A.B.] right now and we would work this out ourselves." Elsberry said the natural mother would not let D.A.B. come to Missouri for a visit "because her mom wouldn't let him."

The natural father asked the natural mother why she did not put his name on the birth certificate and was told that "her dad didn't want my name on there."

The natural mother also claims "undisputed" testimony reveals that the natural mother allowed D.A.B. to talk to the natural father on the telephone and that she regularly showed D.A.B. a picture of the natural father, identifying him as "Daddy." The natural mother suggests this proves she was not attempting to destroy the father-child relationship. However, the natural father testified that the photo album regarding D.A.B. and kept by the natural mother and her parents did not contain any pictures of him. He noted that the maternal grandfather calls D.A.B. "my boy" and that the maternal grandmother is not capable of bearing additional children although "[t]hey said they always wanted a large family."

Once the natural mother and maternal grandparents moved to California, the natural father called frequently. When his great grandmother became ill, he told the natural mother by telephone that his family wanted to see D.A.B. Each time he asked, he was told that the child "wasn't coming back to Missouri to visit" because he was too young. The natural mother's motion in opposition to the natural father's request for temporary visitation noted that a hearing on the matter was to be held in only 49 days. She admitted later, however, that it was not in the "... child's best interests for you to—for [the natural father] to go 49 days without seeing his child."

In short, the record reveals that the natural mother and her parents prefer the visitation issue be handled by lawyers. The natural mother often told the father to "speak to his lawyer," and the maternal grandfather told the natural father that "we can either settle this in court or we can settle it out in the street." The natural mother admitted she holds animosity towards the natural father while the natural father testified that he felt D.A.B. should have a relationship with both he and the natural mother.

■ We have here a young high school girl and boy who became sexually involved and produced a male offspring. That the maternal grandparents are overbearing is clear from the record—a record of acrimony throughout with hardly a page of the 410-page transcript not reflecting an objection or commentary by one or the other of the lawyers involved. There is additional disputed testimony regarding the affects of the maternal grandparents' heavy smoking on D.A.B., and D.A.B. being returned from the natural father's visitation with a diaper rash. Nowhere in the record can this court glean that the best interests of the young boy were paramount—until we review the trial court order which specifically finds that the best interests of D.A.B. will be served by placing his custody with his natural father, D.B.

Essentially, the natural mother disagrees with the trial court's determination of the evidence. While she would characterize the actions of herself and her parents as cooperative and conducive to the child's best interest, the trial court found otherwise. We cannot fault the trial court as there is substantial evidence in the record to support its judgment and findings. We also hold that the trial court's findings and judgment are not against the weight of the evidence.

■ Through 410 pages of transcript, the trial court endured. The trial court demonstrated substantial patience and restraint in presiding over this cause. It is basic

hornbook law that the trial judge's decision regarding credibility will not be second-guessed. *State v. Boggs,* 634 S.W.2d 447, 453 (Mo. banc 1982); *In re Marriage of Plank,* 670 S.W.2d 185, 189 (Mo.App.1984). When the evidence is conflicting, the trial court determines the credibility of witnesses. The trial court may accept or reject all, part or none of the testimony. *In re Marriage of Plank,* 670 S.W.2d 185, 189 (Mo.App.1984). On review, we accept as true the evidence and permissible inferences favorable to the prevailing party and disregard contradictions. *Id.*

In custody matters, the trial court's obligation is to render judgment considering the best interests of the child. *Rumbolo v. Phelps,* 759 S.W.2d 894, 895 (Mo.App.1988). We do not disturb custody awards unless it is clear from the entire record that the trial court abused its discretion or unless we are convinced the child's welfare dictates a disposition different than that made by the trial court. *In re Marriage of M___,* 541 S.W.2d 760, 761 (Mo.App.1976). The trial court is given great deference regarding the credibility of witnesses, evidence and inferences drawn therefrom. *Mehra v. Mehra,* 819 S.W.2d 351 (Mo. banc 1991).

The trial court's decision regarding child custody matters is granted greater deference than in other types of cases. *Hart v. Hart,* 766 S.W.2d 131, 132 (Mo.App.1989). Each case must be examined on its own set of facts and circumstances; there is no inflexible or exact formula to apply in determining a custody matter. *O'Leary v. Stevenson,* 782 S.W.2d 109, 111 (Mo.App.1989).

The trial court here entered a complete and detailed judgment entry in which it specifically found that the best interests of the minor child requires his custody be placed with respondent, subject to reasonable visitation by the appellant. The court further found that the appellant was under the control of her parents "at this time" and that she has been unwilling or unable to accept the responsibility of steady employment or taking care of the child. The court further found that the actions of the maternal grandparents demonstrates a desire to destroy the relationship between the child and respondent, the natural father.

This ruling was based on the trial court's observations at trial, the evidence presented and the trial court's ability to judge the evidence and the credibility of the witnesses. Our independent review reveals that substantial evidence exists to support the trial court's determination and that its judgment was not against the weight of the evidence.

Appellant's Point I is denied.

Appellant's Point II claims there was no showing of a change in circumstance and hence the trial court had no authority to transfer custody. This rationale is misplaced, however, because there had been no prior custody determination. This was an original custody action, not a modification. The standard then is what is in the best interests of the child considering the factors enumerated in § 452.375, RSMo.1994. *Harris v. Harris,* 803 S.W.2d 167, 169 (Mo.App. 1991). For the reasons discussed above, the trial court found the child's best interests will be served by placing custody of the child with the natural father, and we affirm.

Appellant's Point II is denied.

Affirmed.

All concur.