Thomas J. BESANCENEZ, and Sommer Nichole Singletary, By and through her Next Friend Thomas J. Besancenez, Appellants,

v.

Debra Lynn ROGERS, f/k/a Debra Singletary, Respondent.

No. ED 80980.

Missouri Court of Appeals, Eastern District, Division Three.

March 18, 2003.

Michael P. Cohan, St. Louis, MO, for appellant.

Lawrence G. Gillespie, Clayton, MO, for respondents.

MARY R. RUSSELL, Presiding Judge.

Thomas J. Besancenez ("Father") appeals a judgment granting Debra Lynn Rogers f/k/a Debra Singletary ("Mother") primary physical custody of Sommer Nichole Singletary ("Daughter") and awarding Mother attorney's fees and reimbursement for necessaries purchased for Daughter. We find no error and affirm.

Father filed a petition for determination of paternity and an order of child custody and child support. Father requested that he and Mother have joint legal custody, that he obtain primary physical custody, and that Mother receive visitation rights. In the event Father received primary physical custody of Daughter, he petitioned for child support from Mother.

Father filed his petition on January 18, 2000, when Daughter was 12 years old. A guardian ad litem ("GAL") was appointed to represent Daughter's interest in the proceedings, which included six days of testimony. The trial court rendered its judgment on November 20, 2001. Pursuant to the trial court's judgment, Mother has primary physical custody, Father has

visitation rights, and they share joint legal custody of Daughter.

The trial court found that the sum of Daughter's necessary expenditures paid for by Mother from January 1995 to July 28, 2000, was $20,426.70. Father received credit for $4,367.14 he paid for her necessaries during that time. The trial court ordered Father to reimburse Mother for the remaining $16,059.56. Father was ordered to pay $4,613.00 as increased child support in addition to what he paid during the pendency of the suit. The judgment further ordered Father to pay $427.00 per month to Mother for child support, effective on the judgment date. The trial court awarded Mother $12,000.00 for attorney's fees she incurred in Father's paternity, child custody, and child support proceeding. Father now appeals.[1]

Father alleges four errors on appeal. In his first point, he argues that the trial court improperly considered the gender of Mother, Father, and Daughter in awarding primary physical custody to Mother, which is a misapplication of section 452.375.8 RSMo 2000.[2] Father contends in his second point that the trial court failed to issue eight specific factual findings as required by section 452.375, and the evidence demonstrated that the "application of those factors, on balance, as well as other relevant evidence," favored granting Father primary physical custody of Daughter. In his third point, Father alleges that the trial court misapplied the law and abused its discretion in its award of attorney's fees because it failed to consider the financial

situation of both parents and because the evidence demonstrated that Father had insufficient resources to pay the award. Father argues in his fourth point that the trial court misapplied the law and abused its discretion in awarding necessaries to Mother because the award was inconsistent, unsupported by the evidence, and against the weight of the evidence.

■■■ The same standard of review applies to Father's first, second, and fourth points on appeal. We will affirm the trial court's custody determination unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Edmison ex rel. Edmison v. Clarke*, 988 S.W.2d 604, 607 (Mo.App.1999); *Shadwick v. Byrd*, 867 S.W.2d 231, 235 (Mo.App. 1993). The trial court possesses broad discretion in child custody matters, and its decision will only be reversed if we are firmly convinced the welfare and best interests of the child require otherwise. *Edmison*, 988 S.W.2d at 607; *Shadwick*, 867 S.W.2d at 235.

### Do Trial Judge's Remarks Indicate an Improper Preference?

Father alleges in his first point that remarks made by the trial judge to Daughter following closing arguments revealed that the trial court improperly conferred a preference upon Mother's receiving custody strictly because of her gender. Father argues that section 452.375.8 specifically prohibits favoring one parent over another

---

1. Father's brief includes a 37–page dissertation of the facts in the underlying case. Although we do not dismiss his appeal, we find that Father's statement of facts was not a "fair and concise statement of the facts relevant to the questions presented for determination without argument." Rule 84.04(c); *see In re Marriage of Barnes,* 855 S.W.2d 451, 455 (Mo.App.1993) (noting that father's biased

statement of facts portrayed himself as "virtually without fault" and mother as "nearly unfit to be a custodian for her child"). We also encourage Father to read Rule 84.06(f)(1)(D) regarding the proper color coding of appellate briefs.

2. All further statutory references are to RSMo 2000 unless otherwise indicated.

based solely on sex and that custody determinations should be made entirely on the best interests of the child pursuant to section 452.375.2.

 The statements Father finds objectionable were made by the trial court following Mother's and Father's closing arguments. The transcript indicates that Daughter was excluded from the trial aside from her own testimony and the closing arguments and that, at the close of testimony each day, the trial court warned all those involved not to discuss the case with Daughter or in her presence. After the closing arguments, the trial judge called Daughter to stand before him so he could speak directly to her. The judge then made the following remarks, among others, to Daughter:

Well, up until that time, up until the time that the Court, the judge, me in this case, makes a decision, one thing is clear under the law and that is—one person, one person has the authority over the child. One person cares for the child. One person makes decisions for the child. One person does the parenting for the child and that's the mother. That's the mom.... Until I enter an Order in this case your mom has all the authority over you; has always had all the authority over you. And people who have tried to exercise authority over you, without her consent, don't have any business doing it.

People who have derided her in your presence, who have questioned her living circumstances, who have been critical of her way of life, don't have any power to do anything about it and shouldn't even try. They just make it more confused and more difficult for you.... Anyone, whether it is either of your parents or anyone around who talks negatively about your parents, in your presence, is not doing you a favor.

They are being insensitive. They are selfish. And they're really going to hurt you in the long run.

. . . .

Do[ ] she and your father have the right to control what you do? Yes. Because you're the child and they are the parents. Those titles apply.

. . . .

People say in these situations, where there is a lot of stress with parents or between parents, that the children manipulate the parents. They try to get the best out of each parent to their own advantage. I'm sure you never thought of that. Have you? You know. Have you done it?

This record is replete with examples of it and you probably don't see it that way.

. . . .

Now, there are defined roles for people. Before there [weren't]. Now, people who try to interfere with the authority of your mother or your father, as I said before, are undermining your interest. They are making life more difficult for you.

Father relies on *Russell v. Russell*, 782 S.W.2d 406 (Mo.App.1989), for his argument that the remarks made by the trial court constituted an improper award of custody based solely on the application of an improper preference to Mother based entirely on her gender. We concur with Father's contention that section 452.375.8 indubitably prohibits any presumption in favor of either parent based on gender: "As between the parents of a child, no preference may be given to either parent in the awarding of custody because of that parent's age, sex, or financial status, nor because of the age or sex of the child." Our agreement with Father, however, is limited to his statement of the applicable

law, and we find *Russell* wholly distinguishable from the instant case.

In *Russell,* "[t]he trial judge expressed grave misgivings about the mother's conduct but expressly based his custody award upon the need for the girls to be under the care and guidance of a mother." *Russell,* 782 S.W.2d at 407. The trial court specifically warned the mother that the girls would be removed from her custody if she failed to alter her ways considerably. *Id.*

In reversing the trial court's decision and granting sole custody of the two girls to the father, the appellate court found that the mother's behavior "demonstrated a conspicuous lack of judgment" and could be "described in a word as irresponsible." *Id.* It stated that the mother's discipline of her daughters was erratic; she had been sexually promiscuous before her separation from the father and throughout the dissolution; she failed to care adequately for her daughters' health; and her boyfriend was violent and scared the girls, who were six and eight years old when the appellate decision was written. *Id.*

In contrast to the mother's "rather bizarre behavior," the appellate court found that the father was well qualified to have custody of his daughters. *Id.* It noted that the few negative snippets of evidence that cut against his ability to provide a healthy home for the girls were "insignificant when compared to the mother's pattern of conduct." *Id.* Unlike the instant case, the trial court's custody award in *Russell* disregarded the girls' best interests and flagrantly contradicted the statutory prohibition against favoring one parent over the other solely because of the sex of either that parent or the child. *See id.*

Father argues that the trial court's remarks reveal its misapplication of the law and that it looked unfavorably upon him for doing things that section 452.375.2 expressly states are in Daughter's best interests. Father claims the trial court's statements necessarily evidence its "belief that a father, prior to entry of a paternity judgment, should not attempt to be a parent," which results "in an automatic custodial preference to the mother" in violation of 452.375.8. He asserts that an award is not protected from reversal when it is produced by consideration of irrelevant facts.

We concede that the trial court's statements to Daughter following closing arguments were unnecessary, but we find their significance lies in the trial court's efforts to restore damaged relationships between Daughter, Mother, and Father. During the trial, Daughter testified that Mother and Father both indicated they would move to different states if they did not receive custody of her. She explained that her relationship with Mother had deteriorated since the legal proceedings began. The GAL reported that Daughter had wavered between her parents during the past few years in deciding with whom she wanted to live. The trial judge found Daughter's testimony credible that both her parents had made "inappropriate statements" to her at various times.

Father claims that the trial judge's statements to Daughter indicate that the judge was criticizing Father for taking an active role in Daughter's life before a paternity judgment declared him as her father. The judge, however, specifically reinforced Father's authority in at least two segments of his remarks. He told Daughter that the title of mother and father indicate that those two people have the right to control what she does, and he warned Daughter that anyone who tried to interfere with her parents' authority was undermining her interest. The judge also chastised Daughter for her efforts to ma-

nipulate the situation by working her parents against one another to her advantage.

A look at the record on appeal makes it evident that the judge's comments about people speaking negatively about either of her parents in Daughter's presence was directed not only to Mother and Father, but to Father's extended family. At trial, Father criticized Mother's living habits, parenting skills, and choices she made in her personal life. The transcript indicates that several members of Father's immediate family live in the same area as him and participate in his life, as well as Daughter's. While this undoubtedly bestows benefits on them both, a negative aspect is that Mother, whose family members are deceased or live elsewhere, often finds herself outnumbered and becomes subject to disparagement from Father's family.

The trial judge found that Father and his family have continually criticized Mother in Daughter's presence. The judge characterized much of Father's evidence at trial, especially the testimony by Father and his family, as "an ongoing attack upon the person and habits" of Mother. The judge's remarks after closing arguments indicate an effort to refocus Daughter's attention to the fact that the primary decision makers in her life were Mother and Father, and anyone else who indicated otherwise was unnecessarily confusing Daughter's situation.

Although Father argues that the trial court's remarks indicate it employed a preference in Mother's favor when determining which parent should receive primary physical custody of Daughter, we cannot agree. We find the trial judge's statements were merely an attempt to salve the wounds resulting from a highly contested, six-day proceeding for custody of a girl caught in between her parents. Furthermore, the trial court's statements equally admonished Mother and Father not to deride the other in Daughter's presence, and the bulk of the remarks were applicable to outside family members, as well as Mother and Father. Contrary to Father's contention that the custody award was improperly based on irrelevant facts, the trial judge specifically stated in his oral and written pronouncements of the custody judgment that he was acting in Daughter's best interests, and, as discussed below, we agree with this statement. Father's first point is denied.

## Is Custody Award Supported by Required Findings?

In his second point, Father claims the trial court's decision to award Mother primary physical custody is against the weight of the evidence because the application of the statutory factors indicates that it is in Daughter's best interests for him to receive primary physical custody of her. He also requests that the case be remanded because he alleges that the trial court failed to issue eight specific factual findings as required by section 452.375.6.

Section 452.375.2 enumerates eight factors for the trial court to contemplate in determining custody in the best interests of the child.

The court shall consider all relevant factors, including:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may sig-

nificantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved . . . .;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian.

Section 452.375.2.

In his brief, Father applies the factors and concludes that they weigh in favor of him receiving primary physical custody of Daughter. Father's analysis, however, disregards the applicable standard of review, yet our evaluation of his argument must be analyzed within that framework.

 We will not second-guess a trial judge's determination regarding credibility as the trial court evaluates credibility when the evidence conflicts. *In re the Paternity of D.A.B.*, 902 S.W.2d 348, 355 (Mo.App.1995). The trial court may accept or reject none, all, or any portion of the testimony. *Id.* We accept as true the evidence and permissible inferences favoring the prevailing party, and we disregard evidence and inferences contradicting the trial court's conclusion. *See id.* Furthermore, a trial court's decision in a child custody matter receives greater deference than in other types of cases. *Id.*

We now turn to the evaluation of Daughter's best interests pursuant to the eight factors enumerated in section 452.375.2. We note at the outset that the only factor that weighs in favor of Father is the last factor, which is Daughter's preference as to her primary custodian. The other factors either weigh in Mother's favor or are neutral in that they favor neither parent.

 The first factor requires the trial court to consider the wishes of the parents. Section 452.375.2(1). Mother and Father both requested primary physical custody of Daughter, and the GAL's report indicated that he believed both parents love Daughter.

 The second factor involves the child's needs for a "frequent, continuing and meaningful relationship with both parents" and the mother's and father's willingness to perform their parental duties to meet the child's needs. Section 452.375.2(2). Daughter testified at trial that she loves both her parents, and she requested that she be able to spend time with both of them, but she asked that Father receive primary physical custody.

Despite his claim that he is willing to perform his parental duties, Father's past indicates otherwise. Father and Mother lived together before Daughter's birth until she was approximately five years old. Since then, Father has lived in 17 residences in eight different states and has had seven different employers who placed him in various temporary assignments. In his testimony, he summarized his employment pattern as working three months out of state on a contract, then returning to Missouri for approximately one month, then accepting another three-month contract and leaving the state again. Father testified that the changes in employment were voluntarily made on his behalf, and he was aware that accepting those positions would cause him to be away from Daughter.

Aside from testimony that Daughter and her younger half-sister ("Sister"), who is not Father's child, stayed with him a cou-

ple of summers, he failed to indicate what his lifestyle was like during his prolonged absence. He said he believed that if Daughter had been unhappy during that time, "she would have done something about it" because she knew "how to use the child enforcement agencies." Father conceded that Mother raised Daughter primarily when he was absent because "[s]he was there every day." When asked whether his presence was infrequent during the past nine years of Daughter's life, Father testified: "No, I was back two or three times a year plus the summertime. I mean, a couple times a year and the summer, that's pretty frequent I would say."

Aside from short visits with Father in between his work contracts and in the summer, Daughter has lived with Mother her entire life. They have stayed in the same residence, along with Sister, nearly the entire time. During their brief stay elsewhere, they lived in another home in the same subdivision. Daughter testified that Mother has attended parent-teacher meetings and field trips and picked her up from school whenever she was sick.

In contrast, Father testified he had not had much contact with Daughter's school until he needed to request her transcript for the custody proceedings. Daughter testified that Father told her he would pay whatever amount was necessary to allow her to stay at her school if she lived with him, however, he testified that he had not investigated what school she would attend if he received primary physical custody. Additionally, the testimony indicated that Father was unable to abide by the temporary custody order, which required Daughter to live with either parent on alternating weeks, because he could not arrange his schedule to both drop Daughter off at school and pick her up at the end of the day. Father only managed to comply with

the order with his wife's help. He stated that if he received primary custody of Daughter, she could remain at her school for the remainder of the academic year only if Mother was willing to help him.

Daughter testified that Mother required her to do chores and that Mother disciplined her, often grounding her from the telephone or television and radio when her actions were inappropriate. In comparison, the sum of the testimony indicated that Father had never punished Daughter and that his wife did all the cooking and cleaning for the three of them when Daughter stayed with them. Aside from his asking her occasionally to do something, Daughter had no set chores at her Father's, and it was unclear from the record that he had ever disciplined her for anything.

■ The third statutory factor requires an examination of the "interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests." Section 452.375.2(3). One important relationship considered by the trial court under this factor was Daughter's relationship with Sister. Daughter and Sister were born slightly more than two years apart. Daughter testified that she and Sister are extremely close, they talk a lot, and they spend large quantities of time together. Mother, who has primary physical custody of Sister, testified that Daughter and Sister "are very close, as close as sisters can be" and that transfer of Daughter's primary custody to Father would be "very devastating" to Sister. The GAL reported that it was in Daughter's best interests to continue living in the same home with Sister. The trial court's order should maximize the time Daughter and Sister spend together in that Daughter's weekends with Father coincide with Sister's weekends with her father.

Father's wife has two teenage sons of whom she has joint custody. She testified that her sons stay with her only during the summer. Father testified that he did not have separate rooms for the boys and Daughter. He said that when all three teenagers were at his house at the same time, the boys slept downstairs in the basement and Daughter slept upstairs on the couch, with the possible exception of one night when Daughter fell asleep downstairs.

Daughter testified, however, that she had shared Father's basement with one of the boys for approximately two to three weeks during the summer. In addition, she stayed in the same hotel room as the two teenage boys, wholly unrelated to her, when on vacation with Father and his wife. The trial judge, in response to these reports, included a prohibition in his judgment that neither Mother nor Father shall allow Daughter to share a bedroom or hotel room with any males.

■ In its analysis of the fourth factor, the trial court must evaluate "which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent." Section 452.375.2(4). Nothing in the evidence demonstrated that Father had ever impeded Daughter's communication with Mother when she was with him.

As for Daughter's relationship with her paternal family members, Daughter testified that Mother was very active with Father's family. Daughter said Mother lets her see Father's relatives as often as Daughter wants. Daughter's paternal grandparents testified that she spent many weekends with them, as well as other days when she was out of school, and testimony indicated that Daughter also spent time with Father's siblings.

Mother admittedly prohibited Father from talking with Daughter when she was grounded from using the phone. In addition, she also refused contact between Father and Daughter for a 10–month period when she had been granted an *ex parte* order of protection against Father. Mother testified, however, that she had requested the order without the aid of counsel and that she believed it prohibited Father from contacting everyone in her household and not just herself. The trial court apparently believed Mother's explanations for her very limited refusal to allow contact between Father and Daughter and specifically found that Mother "has allowed and encouraged frequent and meaningful contact" between Father, his family, and Daughter.

■ The fifth factor to consider is Daughter's adjustment to her "home, school, and community." Section 452.375.2(5). Daughter has lived in the same neighborhood since she was born and has always attended the same school district. Daughter admitted that she would miss her school, particularly her friends, if she moved to Father's. Daughter testified that she did not have any friends at Father's, and she did not know what school she would attend if she lived there. The GAL concluded that it was in Daughter's best interests to stay in her current school district.

■ Under the sixth factor, the trial court must contemplate the "mental and physical health" of everyone involved, "including any history of abuse of any individuals involved." Section 452.375.2(6). Father argues that the living conditions in Mother's home caused Daughter to become infested with lice for approximately one year, which constituted abuse on Mother's part. Mother alleged that Father had physically abused her, but Father maintains that her allegations are fabricat-

ed and are unsubstantiated by any medical evidence.

Throughout the course of these proceedings, Father has repeatedly lambasted Mother for the condition of her home. Father and his relatives described Mother's home as filthy, cluttered, unorganized, and a disaster. Daughter testified that her home was dirty and that sometimes she was embarrassed to invite her friends inside. Mother conceded that her home, which has three bedrooms and two baths, was often cluttered and messy, but she claims that her leaking storage shed was part of the reason her home was so full. In addition, Mother asserted that sometimes it is difficult for her to clean because of her allergies. Mother testified that she is allergic to many things, including dust, animal dander, clothes dye, dust mites, various chemicals in foods, certain types of shampoo, ragweed, and grass. Father disputes the existence of Mother's allergies, but Daughter confirmed that she has seen Mother have allergic reactions, including hives.

Daughter and Sister had lice for roughly a year, from approximately November 1998 to November 1999. Father and his family members criticized Mother, saying that she failed to treat Daughter properly to rid her of the lice. Daughter testified, however, that Mother put plastic on the mattresses and pillows, put their clothes in plastic, washed everything at the laundromat, and hired professional cleaners to vacuum their home in order to kill the lice. Mother also cut Daughter's hair on the advice of a nurse and used several varieties of shampoos in an attempt to alleviate the problem.

In addition to Mother's efforts to eradicate the lice, Father testified that he and his wife shampooed Daughter and treated the lice. Daughter stated that, in her opinion, Mother had done everything she could think of to eliminate the lice, and the woman married to Sister's father testified that everyone was treating the lice when the girls had it. The GAL concluded that both Father and Mother attempted to combat the lice, but they were unsuccessful for approximately a year.

Father relies on *McArthur v. McArthur*, 982 S.W.2d 755, 756–57 (Mo.App.1998), for his proposition that the presence of lice on Daughter for an extended period of time amounts to abuse or neglect. In *McArthur*, the appellate court found claims that the child repeatedly was infested with body lice, resided in a camper lacking electricity and running water, and had been left alone for significant periods of time constituted sufficient evidence to require the appointment of a guardian ad litem for the child. *Id.*

The record in the instant case indicates that, despite the combined efforts of Sister's father and his wife, Mother, and Father and his family, the lice infestation lingered. We cannot agree that the failure of all these people to eliminate the lice over the course of a year constitutes child abuse, especially considering Daughter's exposure to a multitude of treatments during that time.

With respect to Mother's allegations of physical abuse, Father initially denied that he had abused her, but he later admitted that they had some "push and shove fights" when they were together. Mother testified that Father had punched her three times on one occasion after Daughter was born. Her injuries included swelling on her forehead and bruises on her face, and she claimed that her injuries eventually caused some of her teeth to fall out. Mother testified of two incidents of abuse, and she said Father entered a treatment facility after punching her in order to avoid jail time for assault.

The GAL stated in his report that he did not believe Father's claims that no abuse occurred in the past, but he felt that Mother may have exaggerated her allegations. His belief that the accusations may have been overstated stemmed from the fact that, after the abuse occurred, Mother let Daughter and Sister visit Father in Florida, which indicates she was not in fear for their safety. The trial court specifically found Mother's allegations of abuse credible, but found that Daughter was not in danger of harm by Father because the abuse occurred in the remote past.

■ The seventh factor addresses the intention of either parent to relocate the child's principal residence. Section 452.375.2(7). As stated previously, Mother has lived in the same place nearly the entire time since Daughter was born, and she has not expressed any intent to move. Despite Father's myriad of residences, he has been working through an agency that limits him to local placement, he purchased a home, and he professed an intention to remain in Missouri.

Finally, the eighth factor compels the court to consider the wishes of the child in determining who will receive custody. Section 452.375.2(8). As stated previously, Daughter indicated a preference at trial for Father to receive custody, but she divulged that she had changed her mind before as to which parent she wished to receive primary physical custody. The GAL report reinforced Daughter's admitted indecision, stating that in the past few years, she has wavered as to whether she wants to live with Father or Mother.

■ In sum, our evaluation of the trial court's application of the eight factors of section 452.375.2 within the paradigm created by our standard of review demonstrates that the trial court's award of primary physical custody to Mother was in Daughter's best interests. The only factor that weighed against Mother retaining physical custody was the last one, and it is likely that the trial court's decision accorded little weight to Daughter's preference for Father to receive primary physical custody of her, especially in light of the tentative nature of her proclamation.

We next address the remaining argument in Father's second point on appeal, which is that the trial court's decision failed to make specific findings as to the eight factors in section 452.375.2 and that this case should be remanded for entry of those factual findings. Father's contention derives from section 452.375.6, which requires written findings when the parties have not agreed to a custodial arrangement or when the arrangement they presented to the court is not in the child's best interests. It provides in pertinent part:

> [T]he court shall include a written finding in the judgment or order based on the public policy in subsection 4 of this section[3] and each of the factors listed in subdivisions (1) to (8) of subsection 2 of this section detailing the specific relevant factors that made a particular arrangement in the best interest of the child. If a proposed custodial arrangement is rejected by the court, the court shall include a written finding in the judgment or

**3.** Section 452.375.4 declares that it is the public policy of Missouri that "frequent, continuing and meaningful contact with both parents" after they have separated is in the child's best interests, unless the court specifically finds otherwise. It proclaims that the state encourages "parents to participate in decisions affecting the health, education and welfare of their children, and to resolve disputes involving their children amicably through alternative dispute resolution." It instructs the court to fashion a custody arrangement so as to further these policies insofar as they are in the child's best interests.

order detailing the specific relevant factors resulting in the rejection of such arrangement.

Section 452.375.6. Father argues in his brief that section 452.375.6 requires the trial court "to make written findings of fact as to each and every one of the eight factors set forth in section 452.375.2, detailing the specific relevant factors that make a particular arrangement in the best interest of the child." He relies on *Brandow v. Brandow,* 18 S.W.3d 584 (Mo.App. 2000), for his contention that we should remand this case because the trial court failed to make the "laundry list" of findings required under the statute.

The Western District of this court addressed *Brandow* recently in *Davidson v. Fisher,* 96 S.W.3d 160 (Mo.App.2003). *Davidson* asserts that section 452.375.6 requires written findings to ensure that the trial court describes all the pertinent considerations in order to facilitate meaningful appellate review. *Davidson,* 96 S.W.3d at 164. *Davidson* continues by stating that no authority, however, requires the trial court to specifically discuss each factor listed in section 452.375.2 whether it considers them pertinent or not. *Davidson,* 96 S.W.3d at 164.

The trial court in *Davidson* wrote findings for two of the eight factors, and the appellate court held that was sufficient to comply with the requirement in section 452.375.6 that the trial court issue findings as to the "specific relevant factors that made a particular arrangement in the best interest of the child." *Davidson,* 96 S.W.3d at 164 (*quoting* section 452.375.6). The appellate court affirmed this aspect of the trial court's decision because it "discussed the two factors it considered the most relevant." [4] *Id.* It distinguished *Brandow* by saying that the trial court in

*Brandow* neglected to make any factual findings, whereas in the decision it was reviewing, the trial court made specific relevant findings even though it did not render findings as to each factor enumerated in section 452.375.2. *Id.; see Brandow,* 18 S.W.3d at 588. We note that the custody award in *Brandow* was affirmed even though the appellate court remanded that portion of the judgment with instructions to enter written findings in compliance with section 452.375.6. *Brandow,* 18 S.W.3d at 588.

At oral argument for the instant case, the parties discussed this court's recent decision in *Gross v. Helm,* 98 S.W.3d 85 (Mo.App.2003), and stated that it conflicts with *Davidson.* We reversed the trial court's decision in *Gross* because it failed to "include a written finding, in its judgment, detailing the specific relevant factors that made its custody arrangement in the best interest of the children." *Gross,* 98 S.W.3d at 88. The trial court's judgment merely stated that there was a change of circumstances that was "continuous and substantial ... and require[d] a modification of the judgment ... and that it would be in the best interest of the minor children that [the f]ather be granted primary physical custody ... with reasonable and seasonable visitation with [the m]other." *Id.*

As in *Brandow,* the trial court in *Gross* essentially failed to include any factual findings pursuant to section 452.375.2. *See Gross,* 98 S.W.3d at 87; *Brandow,* 18 S.W.3d at 588. *Gross* remanded to the trial court with "instructions for the court to make the required written findings in compliance with section 452.375.6." *Gross,* 98 S.W.3d at 88. Nothing in *Gross* requires anything more than the requirement in

---

4. The trial court's decision was reversed in *Davidson,* but it was for reasons unrelated to the claim that it failed to make the written

findings with respect to the eight factors in section 452.375.2.

section 452.375.6 that the trial court include, in certain situations, written findings based on "each of the factors listed in [section 452.375.2] detailing the specific relevant factors that made a particular arrangement in the best interest of the child." Section 452.375.6. As such, we find no discord between *Davidson* and *Gross*, and we consider whether the trial court in the instant case authored the necessary statutory findings.

The trial court's judgment included 19 separately numbered findings with respect to Daughter's custody. Although the judge did not specifically correlate his findings with those required in section 452.375.6, we find the written judgment sufficiently details the specific relevant factors why the arrangement it ordered was in Daughter's best interests, as well as conveying why the arrangement proposed by Father was rejected. Father's second point is denied.

### Is Award of Attorney's Fees an Abuse of Discretion?

Father argues in his third point on appeal that the trial court misapplied the law and abused its discretion in awarding Mother attorney's fees because it failed to consider Mother's and Father's financial resources in making the award. He contends the evidence demonstrated that he lacked financial resources to pay the award.

In a paternity action, the trial court may enter judgment in the amount of "reasonable fees for counsel, experts, the child's guardian ad litem and other costs of the action." Section 210.842. The trial court is considered an expert on attorney's fees, and an award of attorney's fees lies within its sound discretion. *In the Interest of J.D.B.*, 836 S.W.2d 520, 521 (Mo.App.1992). It may assess an amount for attorney's fees without the aid of evidence. *Id.*

We will not reverse an award of attorney's fees unless the amount is arbitrary or indicates a lack of proper judicial consideration. *Id.* The trial court's position allows it to appraise the credibility of the parties and the sincerity of their positions, which often is not easily detected from the record on appeal. *Prosser v. Rethorn*, 928 S.W.2d 364, 365 (Mo.App. 1996).

Father argues that the trial court's award for attorney's fees constituted an abuse of discretion because "the sum total the trial court ordered Father to pay is in excess of his yearly gross income." In addition to paying a portion of Mother's attorney's fees, the total amount Father was ordered to pay included money for back child support; GAL fees; 75 percent of counseling fees for himself, Mother, and Daughter; reimbursement to Mother for Daughter's necessaries; and child support.

Father's income is more than twice as much as Mother's. He testified at trial that he had some funds available to pay for an award of the GAL's fees or attorney's fees. The court admitted an exhibit indicating the amount Mother owed for her legal representation in the underlying proceedings. The reason Father was ordered to pay so much money is because he left Daughter in Mother's care for approximately nine years without contributing an appropriate share for her cost of living. Based on the foregoing, we find that the trial court did not abuse its discretion in awarding $12,000.00 to Mother for her attorney's fees.

### Does Necessaries Award Include Reimbursement for Nonessential Items?

In his final point, Father claims that the trial court's award to Mother for necessaries misstates the law and is an abuse of discretion because it is unsupported by the

evidence in that Mother's calculation of necessaries included undocumented cash expenditures and items plainly not purchased for Daughter's support. He argues that the trial court inconsistently refused to credit him for his cash expenditures for Daughter, yet it required him to reimburse Mother for similar expenses.

The evidence in the record on appeal[5] indicates that Mother submitted approximately $92,000.00 worth of itemized expenditures that she claims were for necessaries. She then divided that sum by three, or the number of people in her household, and requested that amount from Father for previously purchased necessaries for Daughter. Mother was unable to produce explanations for all of the disbursements, but the transcript indicates that she admitted a sack of the receipts she could find for money spent solely for Daughter. The transcript notes that certain highlighted items listed on the exhibit were not included in the total, but were included to inform the trial judge that Daughter had also received non-necessary items while in Mother's care.

Father contends that reimbursement for necessaries is categorically limited in scope to items like food, lodging, clothing, medical attention, and educational expenses. See Josey v. Forde, 338 S.W.2d 14, 15 (Mo.1960); Landoll v. Dovell, 778 S.W.2d 846, 848 n.2 (Mo.App.1989). Mother conceded during her testimony that the amount she submitted for necessaries expenditures included charges for services like cutting her grass, sharpening her shears for her job as a hairstylist, and income tax completion.

We note, however, that her list was chronologically itemized and the charges

totaled more than $90,000.00. In comparison, the trial judge found she spent $20,426.70 for necessaries. He discounted that amount by $4,367.14 to allow Father credit for money he spent on Daughter's necessaries for the relevant period and ordered Father to reimburse Mother for the remaining $16,059.56.

The Southern District faced similar claims by parents in Babb v. Pfuehler, 944 S.W.2d 331, 336 (Mo.App.1997). The mother presented a 27–page list spanning several years that detailed expenditures for the child's necessaries. Id. The list was "meticulously itemized" and included payments for expenses that were inarguably necessaries. Id. In addition, the mother individually listed items that "may not have constituted necessaries," including cable television and school pictures. Id. The mother's expenses totaled $62,078.85. Id. The jury awarded her $40,000.00, which was affirmed by the appellate court despite the father's argument that the mother's calculation indicated merely an estimate calculated by her solely in preparation for trial. Id. The appellate court stated that the mother's evidence was sufficient to support the jury's award. Id. at 337; see Shadwick, 867 S.W.2d at 235 (mother's testimony sufficient to overcome absence of receipts in necessaries award).

As in Babb, we find the trial court's award for necessaries reflects a significant reduction compared with the sum from Mother's itemized list of expenditures. Mother's award, which included reimbursement for expenses incurred by her from January 1995 to July 28, 2000, was amply supported by the evidence.

5. The parties failed to include Mother's original exhibit in the record on appeal. The transcript, however, explains that an exhibit filed by Father was a photocopy of Mother's exhibit with his objections written on it. We used the exhibit from Father to evaluate the contentions in his fourth point on appeal.

■ We next turn to Father's assertion that the trial court's necessaries award was inconsistent because it allowed Mother to receive credit for undocumented and unexplained cash expenditures, yet its judgment included a finding that his calculation of expenses for Daughter included "inappropriate, undocumented cash expenditures," as well as unnecessary expenses. Father, as appellant, did not include in the record on appeal his exhibit in which he documented his expenditures, nor did either party include the exhibit that included Mother's protests to specific expenses claimed by Father. *See* Rule 81.12(c); Rule 81.16. As such, we cannot evaluate the merit of his argument.

Father's fourth point on appeal is denied. The judgment of the trial court is affirmed.

CLIFFORD H. AHRENS, J., and BOOKER T. SHAW, J., concur.