**Robert ABBOTT, Appellant,**

v.

**Teresa PEREZ, Respondent.**

**No. ED 83306.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 3, 2004.

---

4. Respondent's Motion to Seal Exhibit is granted.

Richard J. Eisen, Clayton, MO, for appellant.

Charles P. Todt, Clayton, MO, Daniel R. Schramm, Chesterfield, MO, for respondent.

Nels C. Moss, Jr., Clayton, for Guardian Ad Litem.

PATRICIA L. COHEN, Judge.

### Introduction

Dr. Robert Abbott ("Husband") appeals the decision of the Circuit Court of the City of St. Louis dissolving his marriage to Dr. Teresa Perez ("Wife"), dividing the parties' marital debts, entering custody and child support orders and ordering Husband to pay a portion of Wife's attorneys' fees.

In his appeal, Husband argues that the trial court: (1) improperly conditioned temporary custody of Child on the occurrence of a future event, rendering the judgment indefinite and unenforceable; (2) erroneously granted Wife primary physical and sole legal custody of Child; (3) erroneously awarded retroactive support to Wife and imputed an income of $200,000 per year to Husband; (4) failed to grant Husband the maximum custody allowance in light of the number of days Child is in

Husband's custody; (5) erroneously ordered Husband to share in the cost of a private education for Child; (6) erroneously allocated 50% of the marital debts to Husband and 50% of the marital debts to Wife despite the fact that Wife voluntarily stopped working after the parties' separation; and (7) erroneously ordered Husband to pay $16,000 of Wife's attorneys' fees. We affirm all aspects of the trial court's judgment with the exception of the trial court's calculation of retroactive support. On that point alone, we reverse and remand for further proceedings consistent with this opinion.

### Statement of the Facts and Proceedings Below

Viewed in the light most favorable to the trial court's decision, the evidence adduced at a four-day hearing established the following: Husband and Wife married on June 6, 1997 in Chicago, Illinois. At the time of their marriage, Husband was engaged in plastic surgery research and Wife was in dental school. In the summer of 1998, Husband and Wife moved to Tampa, Florida so that Husband could begin the plastic surgery residency program at the University of South Florida.

Husband and Wife lived in Florida for three years. Evidence indicates that Husband and Wife had a tumultuous relationship while in Florida. At one point, Wife left Florida and returned to her parents' home near Chicago. During this time, Wife practiced dentistry in Illinois and Husband remained in Florida. Wife testified that Husband persuaded her to return to Florida with a promise that they could start a family. When Wife returned to Florida, she became pregnant. Wife, who is of Bolivian descent, testified that, while she was pregnant, Husband referred to

her in an ethnically derogatory fashion, commented on the baby's ethnic heritage and stated that the baby "better not be dark." Husband even suggested that they call the baby "taco" or "burrito." On August 31, 2000, Wife gave birth to Nathaniel Abbott ("Child").[1]

As a plastic surgery resident, Husband worked approximately 80 hours per week. As a result, Wife alleged that during the first year of Child's life, Wife cared for Child without any assistance from Husband. Husband and Wife also had physical confrontations while in Florida. Husband kicked a hole in a door, grabbed Wife, held her down by the arms and became violently angry. During this time, Husband also verbally abused Wife, repeatedly using extreme profanity and ethnic slurs related to her Bolivian heritage. At trial, Husband admitted to some of the verbal abuse.

Husband and Wife moved to St. Louis, Missouri in June of 2001 when the plastic surgery program at the University of South Florida closed. While in St. Louis, Husband worked as a plastic surgery resident at Washington University and Wife worked as a dentist. With both Husband and Wife working, the parties enrolled Child in daycare. Husband's work schedule in St. Louis was less demanding that his schedule in Florida. As a result, Husband began to help with some of the child-rearing responsibilities. However, Wife continued to be Child's primary caretaker. In fact, despite working full-time, Wife took Child to daycare in the mornings and picked him up after work, prepared dinner, fed and changed Child and took off work when Child was ill or had doctor's appointments. Husband admitted that Wife woke Child in the morning, fed Child

1. The trial court identified Child's name as Nathaniel, although at times, Husband referred to Child by the name Nathan. We defer to the trial court's characterization.

and picked up Child from daycare most of the time. Husband also acknowledged that he never stayed home from work when Child was ill.

Husband and Wife's relationship grew progressively more violent while in St. Louis. Husband threw Wife against a closet, punched Wife in the chest with a closed fist and shoved Wife while she was holding Child. Husband testified that Wife was the aggressor in several of the physical confrontations that took place in St. Louis. Wife also admitted that she yelled, screamed, hit and scratched Husband. Wife further admitted slapping Husband on several occasions although she contends the slaps were in response to Husband's derogatory name-calling and foul language.

On February 14, 2002, Wife removed Child from daycare in St. Louis and took him to her parents' home in Burr Ridge, Illinois. Wife admitted that, prior to leaving, she disabled the telephone at the St. Louis apartment to prevent Husband's parents from contacting Husband.[2] Wife further admitted to calling Husband from Illinois and leaving messages threatening not to return with Child and further threatening to take money from a joint money market account.

In her testimony, Wife attempted to justify her actions on and around February 14, 2002 by explaining that she was extremely ill with high fevers, severe headaches, dizziness and exhaustion. Wife explained that, at that time, Child was also extremely ill. Wife stated that she called Husband, and complained about how sick she and Child were and forewarned Husband that she and Child were going to Chicago whether he liked it or not. Wife and her father returned to St. Louis ap-

proximately nine or ten days later. However, Wife did not bring Child with her because both she and Child were still ill. Both Wife and her father testified that Husband became violent toward both of them when they returned to the apartment in St. Louis. Husband and Wife separated in February of 2002.

Husband filed a Petition for Dissolution of Marriage on July 1, 2002. In his Petition, Husband sought sole legal and physical care, custody and control of Child, subject to Wife's reasonable rights to visitation and temporary custody. Husband also sought child support, both generally and pendente lite, retroactive to July 1, 2002. Husband further requested a set-off of his non-marital property and an equitable division of the couple's marital property and debts. Wife filed a Cross–Petition for Dissolution of Marriage that same day. In her Cross–Petition, Wife sought sole legal and physical care, custody and control of Child, subject to Husband's reasonable rights to visitation and temporary custody, as well as authorization to relocate Child from St. Louis to Burr Ridge, Illinois. Wife also sought child support, both generally and pendente lite, retroactive to July 1, 2002. Wife further requested the court to set apart her separate property, an equitable division of the couple's marital property and debts, attorneys' fees and costs.

On July 1, 2002, the parties also filed a Consent Judgment and Order Pendente Lite agreeing, *inter alia*, that during the pendency of the proceeding: (1) Husband and Wife shall have joint legal and joint physical custody of Child; (2) neither party will remove Child from Missouri for more than ninety days without court au-

**2.** Husband's parents were visiting from Illinois at the time and staying in Husband and Wife's St. Louis apartment.

thorization; (3) Husband shall pay Wife $400.00 per month for support of Child; (4) Husband shall maintain insurance on Child through his employment; (5) neither party will transfer, encumber, conceal or dispose of property except in the ordinary course of business; and (6) Husband shall notify Wife of his call schedule at least two weeks in advance of his being on call.

The court heard the case on the merits from March 4, 2003 through March 7, 2003. At the time of trial, Husband was working as a plastic surgery resident at Washington University earning a gross monthly income of $3,692. Husband's residency was scheduled to terminate on June 30, 2003. At the time of trial, Husband did not have any job offers. Husband testified that, although he was looking for jobs in places other than Missouri, he would like to stay in St. Louis at the end of his residency because both he and Child had fostered friendships and relationships in St. Louis. Husband explained that a suitable job for him upon completion of his residency would pay $175,000 each year. A vocational rehabilitation counselor testified at trial that a plastic surgeon working in Chicago would earn a median base salary of $222,868.

At trial, Wife explained that she last worked as a full-time dentist on June 28, 2002 when her contract at Premier Dental in St. Louis expired. Wife's 2001 federal income tax return showed gross receipts for Wife's yearly income of $88,570. Wife also suggested that her contract with Premier Dental was not renewed because of the number of days she missed due to Child's illnesses, her own illness and appointments with her attorney. Wife admitted, however, that she had previously told her employer that she did not plan to return because she hoped to move to Chicago. The vocational rehabilitation counselor testified that Wife was employable as a dentist in St. Louis at a salary of approximately $100,000.

Both Husband and Wife offered expert testimony regarding their respective proposed custody arrangements. Husband's expert, Dr. David Clark, classified himself as a scholarly witness and explained that, in formulating his opinions in preparation for trial, he reviewed literature but did not examine either Husband or Wife. In his testimony, Dr. Clark expressed general opinions about the benefits of positive parental involvement for young children.

Wife's expert, Dr. Terrence Rohen, testified regarding the option of permitting Wife to have primary custody of Child in Burr Ridge, Illinois. Dr. Rohen explained that in formulating his opinion, he conducted psychological tests and evaluations of Wife and her parents, he visited Burr Ridge, Illinois and observed Child's interactions with Wife and her parents. Dr. Rohen opined that Burr Ridge, Illinois is an appropriate environment for Child.

On April 3, 2003, the court entered its initial Findings of Fact, Conclusions of Law and Judgment. The court concluded, *inter alia:* (1) Husband and Wife's marriage shall be dissolved; (2) Wife and Child's relocation to Burr Ridge, Illinois is in Child's best interest; (3) it is in Child's best interest that Wife be awarded sole legal custody and primary physical custody with Husband having temporary custody and visitation pursuant to the Parenting Plan; (4) Husband shall pay Wife $907 per month in child support, retroactive to July 1, 2002, with Husband receiving a $400 credit per month for each month child support has been paid; (5) Husband shall maintain and pay for health coverage for Child and all expenses not covered by insurance, including any deductible, shall be paid 50% by Husband and 50% by Wife; (6) Husband shall repay $15,000 which he transferred to his parents, the first

$10,442.50 shall be used to pay Guardian ad litem fees, the remaining sum to be split between the parties; (7) Wife shall pay $285.00 directly to St. Louis Children's Hospital Child Development Center as and for the remaining portion of the early withdrawal fee accrued when Wife unilaterally withdrew Child from the daycare; (8) Wife is capable of paying her own attorneys' fees; and (9) Husband and Wife shall each pay 50% of the costs associated with Dr. Richard Scott's psychological evaluation.

Husband filed a Motion for New Trial and/or To Amend the Judgment or Reopen the Evidence on May 2, 2003. On June 26, 2003, Wife filed her Response to [Husband's] Motion for New Trial and Suggested Amendments to Judgment. Husband later withdrew his request to reopen the evidence. That same day, Husband called up a Motion for Disqualification of the Guardian Ad Litem.

On July 31, 2003, the court issued its Amended Judgment. In its Amended Judgment, the court overruled Husband's Motion to Disqualify the Guardian Ad Litem and further concluded, *inter alia:* (1) Husband and Wife's marriage shall be dissolved; (2) Wife and Child's relocation to Burr Ridge, Illinois is in Child's best interest; (3) it is in Child's best interest that Wife be awarded sole legal custody and primary physical custody with Husband having temporary custody and visitation pursuant to the Parenting Plan; (4) Husband shall pay Wife $945 per month in child support, retroactive to July 1, 2002, with Husband given a $400 credit per month for each month child support has been paid; (5) Husband shall maintain and pay for health coverage for Child and all expenses not covered by insurance, including any deductible, shall be paid 50% by Husband and 50% by Wife; (6) Husband shall repay $15,000 which he transferred to

his parents, the first $10,442.50 shall be used to pay Guardian ad litem fees, the remaining sum to be split between the parties; (7) Wife shall pay $285.00 directly to St. Louis Children's Hospital Child Development Center as and for the remaining portion of the early withdrawal fee accrued when Wife unilaterally withdrew Child from the daycare; (8) Husband shall pay $16,000 to the Todt Law Firm, as and for Wife's attorney's fees; and (9) Husband and Wife shall each pay 50% of the costs associated with Dr. Richard Scott's psychological evaluation. Husband appeals.

### *Standard of Review*

■ Our review of a trial court's Amended Judgment dissolving the marriage of Husband and Wife is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We will affirm the judgment of the trial court unless no substantial evidence supports the decision, it is against the weight of the evidence, or it erroneously declares or applies the law. *Krost v. Krost*, 133 S.W.3d 117, 119 (Mo.App. E.D. 2004). We view facts and reasonable inferences in the light most favorable to the trial court's decision and defer to the trial court's superior ability to determine the credibility of witnesses. *Id.*

■ The trial court has broad discretion with respect to custody and visitation issues. *Lavalle v. Lavalle*, 11 S.W.3d 640, 646 (Mo.App. E.D.1999). We refrain from overturning the trial court's decision unless it is not in the child's best interest. *Id.*

### *Discussion*
#### A. *Temporary Custody Schedule*

■ The Amended Judgment incorporates a Parenting Plan which provides that Husband shall have temporary custody of Child on alternate weeks until Child reach-

es the age of five and is enrolled in elementary school. Thereafter, Husband's temporary custody changes to alternate weekends, from Friday at 3:00 p.m. to Sunday at 6:00 p.m., six weeks in the summer and on specified holidays. Because the trial court used Child's future age and attendance in school to trigger a change in the temporary custody schedule, Husband asserts that the trial court improperly conditioned temporary custody on the occurrence of a future event, rendering the judgment indefinite and unenforceable.

Contrary to Husband's contention, the Amended Judgment here does not constitute a conditional judgment. As we have previously held, "a conditional judgment ... is one where enforcement is dependent upon the performance of future acts by a litigant and which is to be annulled if default occurs...." *Burch v. Burch*, 805 S.W.2d 341, 343 (Mo.App. E.D.1991) (citation omitted). In this case, neither Husband nor Wife is required to perform or refrain from performing any future act as a condition of the enforcement of the custody provisions. Rather, the focus is on Child who, barring a tragedy, will undoubtedly reach age five and enroll in elementary school. Point denied.

### B. Custody

■ Husband contends that the trial court erred because the award of primary physical and sole legal custody to Wife was against the weight of the evidence and was based on an erroneous application of Section 452.375.2 RSMo 2000.[3] In support of his contention, Husband essentially argues that the evidence presented could support findings contrary to those entered by the court. We defer to the trial court's decision when there is conflicting evidence or evidence which would support a contrary conclusion. *McAllister v. McAllister*, 101 S.W.3d 287, 290 (Mo.App. E.D.2003). Moreover, "greater deference is given to the determination of the trial court in child custody matters than in other cases." *Brown v. Brown*, 19 S.W.3d 717, 720 (Mo. App. W.D.2000).

■ The trial court's determination of custody is governed by the factors enumerated in Section 452.375. *Reisinger v. Reisinger*, 125 S.W.3d 879, 883 (Mo.App. E.D.2004). Although Husband does not dispute that the trial court applied the factors set forth in the statute, he claims that because the record contains evidence which would support contrary conclusions with respect to the factors, the trial court "misapplied the law."

The record contains support for each of the trial court's findings. The first factor requires the court to consider the wishes of the parents. As the trial court found, both Husband and Wife requested primary physical custody of Child. Wife's proposed parenting plan suggests that she and Child would live in Burr Ridge, Illinois because Husband did not know where he would be living after the completion of his residency program in June of 2003.

The second factor requires the court to consider Child's need for a frequent, continuing and meaningful relationship with both parents and the willingness of each parent to perform their functions as mother and father. The trial court's determination that Wife actively performed her role as mother while Husband worked very long hours as a plastic surgery resident is amply supported by the evidence. Even if, as Husband contends, he assumed a greater role in parenting after moving to St. Louis, there is no question, based on the evidence, that Wife had significantly greater involvement in every conceivable parenting function.

---

**3.** All further statutory references are to RSMo 2000 unless otherwise noted.

The third factor requires the court to consider the interaction and interrelationship of Child with the parents and any other person who may significantly affect Child's best interest. The record clearly shows that Child has close relationships with extended family including Wife's parents and sister as well as Husband's parents all of whom live in or near Chicago, Illinois. In particular, it is undisputed that Child formed a particularly strong bond with his maternal grandfather.

The fourth factor requires the court to consider which parent is more likely to allow Child frequent, continuing and meaningful contact with the other parent. Husband contends that the trial court failed to make findings with respect to this factor and ignored evidence that Wife "had no intention of ensuring that [Child] had a frequent, continuing and meaningful relationship with [Husband]." Contrary to Husband's contention, the trial court specifically found that "[it] cannot reasonably determine that Husband will allow Child frequent and meaningful contact with Wife...." In making this finding, the court focused on Husband's uncertain future and his evasiveness when asked of his plans. By contrast, the court noted that Wife had allowed Husband and his family access to Child in Chicago as evidenced by photographs Husband presented at trial. See *Besancenez v. Rogers*, 100 S.W.3d 118, 128 (Mo.App. E.D.2003) (fourth factor supported by evidence of visits to paternal grandparents). Although Husband claims on appeal that he testified at trial to his efforts to keep Child in contact with Wife, he provides no citation to the transcript. Thus, like the trial court, we find no basis to credit Husband's assertion that he is more likely to allow Child frequent, meaningful contact with Wife.

The fifth factor requires the court to consider Child's adjustment to home, school and community. The evidence clearly supports a finding that the move to Burr Ridge, Illinois does not pose adjustment problems for Child. Child was born in Florida on August 31, 2000 and moved to St. Louis in June of 2001. On February 14, 2002, Wife and Child moved from St. Louis to Burr Ridge, Illinois. Child is not enrolled in daycare in St. Louis and thus does not have to adjust to a change in his childcare. Moreover, Wife will work four days each week at her new job in Burr Ridge, Illinois and, because Wife and Child will be living in Wife's parents' home, Wife's mother has agreed to stay at home to care for Child during the day until Child adjusts to daycare in Burr Ridge.

The sixth factor requires the court to consider mental and physical health of all parties involved including any history of abuse. The record confirms that Husband and Wife had a violent relationship. Evidence adduced at trial substantiates the trial court's finding that Husband has verbally disparaged Wife and Child by using profane language and ethnic slurs. The record also indicates that Husband has thrown Wife against a closet, punched Wife in the chest and shoved Wife while she was holding Child. In light of this history, this factor clearly favors Wife and psychological testing indicated that Wife functions within normal psychological limits and, likewise, does not exhibit any disabling psychopathology.

The seventh factor requires the court to consider either parents' intention to relocate Child's principal residence. As the trial court concluded, this factor favors Wife. The record supports the trial court's finding that Wife has been Child's primary caretaker since birth. Wife informed the court that she planned to relocate from St. Louis to Burr Ridge, Illinois where she secured a lucrative job as a dentist. At the time of trial, Husband remained un-

clear about where he would be residing at the conclusion of his residency program. As a result, regardless of which parent the court awarded primary custody, Child's principal residence would likely ultimately change from St. Louis. In granting Wife's request to relocate Child to Burr Ridge, the court chose a stable environment surrounded by extended family. Moreover, the court established a detailed visitation schedule, allowing Husband 183 overnight visits with Child each year. The court further designated a meeting place half way between St. Louis and Burr Ridge to ensure convenience to Husband and Wife. Clearly, in light of Husband's uncertain location at the conclusion of his plastic surgery residency, Child's move to Burr Ridge is warranted.[4]

■ Husband's argument that the trial court did not consider Wife's misconduct in removing Child from daycare and taking him to Chicago when she was ill is not supported by the record. The trial court discussed Wife's actions and although critical of her behavior, concluded that, on balance, Child's best interests were served by awarding primary legal and physical custody to Wife. The court possesses broad discretion in child custody matters, and that discretion will only be reversed if we are firmly convinced the welfare and the best interest of Child require otherwise. *Reisinger*, 125 S.W.3d at 883. There is ample evidence to support the court's findings that it is in Child's best interest that Wife shall have sole legal custody and Child shall reside primarily with Wife. Point denied.

## C. *Retroactive Support, Imputed Income, Custody Allowance and Private Schooling*

In his third point, Husband contends that the trial court erred when it awarded retroactive support to Wife and imputed an income of $200,000 per year to Husband. Husband further asserts that the trial court erred in not granting him a greater custody allowance in light of the number of days that Child would be in Husband's custody each year. Furthermore, Husband contends that the trial court erred when it ordered Husband to share in the cost of private schooling for Child.

### 1. *Retroactive Child Support and Imputed Income*

■ Husband contends that the trial court erred when it awarded retroactive support to Wife and imputed an income of $200,000 per year to Husband.[5] It is within the trial court's discretion to award child support retroactive to the date of the filing of the Petition for Dissolution. Section 452.340.1. Accordingly, the trial court has considerable discretion in matters of child support, including making child support awards retroactive and we will not reverse its judgment absent an abuse of that discretion. *Kolar v. Kolar*, 114 S.W.3d 440, 445 (Mo.App. W.D.2003).

To determine whether to award retroactive child support, the trial court considers: (1) the financial needs and resources of the child; (2) the financial needs and resources of the parents; (3) the standard of living the child would have enjoyed had the marriage not been dissolved; (4) the child's

---

4. Factor eight, which requires the court to consider Child's wishes, does not apply due to Child not being "of sufficient age to form and express an intelligent custodial preference." *Babbitt v. Babbitt*, 15 S.W.3d 787, 789 (Mo. App. S.D.2000).

5. We address only the imputation of income as it relates to the retroactive award as we do not find any merit to the argument that a prospective imputation of an income of $200,000 per year upon Husband's full licensure as a plastic surgeon is erroneous.

physical and emotional condition as well as the child's educational needs; (5) the physical and legal custody arrangements, including the amount of time the child spends with each parent as well as the reasonable expenses associated with custody or visitation; and (6) the reasonable work-related child care expenses of each parent. Section 452.340.1.

In this case, the trial court considered these factors and directed Husband to pay Wife $945 per month as and for child support retroactive to the filing of Husband's Petition for Dissolution of Marriage on July 1, 2002 with Husband given a $400 credit per month for each month of support he has paid. In reaching this conclusion, the court acknowledged that, despite being unemployed at the time of trial, Wife was capable of earning $88,570 as a dentist and therefore, imputed that income to her. The court likewise concluded that Husband "is capable of earning a gross income of ... $200,000, or ... $16,666 per month" and therefore, imputed that income to him.

Husband argues that the trial court incorrectly calculated the retroactive award based on the imputed income of $200,000 because, from July 1, 2002 through the conclusion of the case, Husband was completing his plastic surgery residency at Washington University and, as a resident, was only capable of earning a gross monthly salary of $3,692. Husband contends that, until the successful completion of his residency program on June 30, 2003, he was not employable as a plastic surgeon and therefore, was not capable of earning $200,000 per year, or $16,666 per month. We agree.

■ Although income may be imputed to Husband for the purpose of calculating

child support, the imputed income must be within Husband's capacity to earn. *Foster v. Foster*, 844 S.W.2d 559, 562 (Mo.App. E.D.1992). In this case, there is no evidence in the record supporting the conclusion that, during the pendency of this case, or the period covered by the retroactive support, Husband's gross monthly salary failed to meet his earning potential. Accordingly, we conclude that the trial court abused its discretion when it awarded retroactive support based on the imputed monthly salary of a plastic surgeon to Husband, a plastic surgery resident, whose education and experience allowed him to earn only $3,692 each month. As a result, we must reverse the portion of the Amended Judgment awarding Wife $945 per month in retroactive child support and remand the case to the trial court for findings consistent with this opinion.[6]

### 2. *Custody Adjustment*

■ Husband likewise contends that the trial court erred in failing to give him a maximum child support allowance of 34% because Child is in his care for 183 overnights per year. In support of his contention, Husband cites *McCandless–Glimcher v. Glimcher*, 73 S.W.3d 68 (Mo.App. W.D. 2002) and states "[t]he maximum overnight visitation adjustment for having children 183 days per year is thirty-four (34%) percent."

■ Husband erroneously implies that *Glimcher* mandates a 34% adjustment where a parent has 183 overnight visitations per year. To the contrary, "the trial court may award the maximum adjustment if it wants to do so. Nothing in that language is mandatory...." *Krost*, 133 S.W.3d at 121–22. While the Form 14 allows for adjustments to the child support

---

**6.** To the extent that Husband challenges the prospective child support amount which covered the period of time after the conclusion of his residency, and was also based on an imputed plastic surgeon's income of $200,000, this point is denied.

amount based on a child's overnight visitations with the parent paying support, Line 11 does not specify an exact child support allowance for a parent granted more than 109 overnight visits with their child per year. Instead, Form 14, Line 11 states: "[i]f the parent obligated to pay support is or has been awarded periods of overnight visitation or custody for more than 109 days per year, the adjustment for that parent may be greater than 10%."

Here the record reveals that trial court considered the appropriate factors and set the custody adjustment at 15%, clearly an adjustment greater than 10% as permitted by Line 11 of the Form 14. Accordingly, the record does not support the contention that the trial court abused its discretion in awarding a 15% custody adjustment to Husband. Point denied.

### 3. Private Schooling

■■■ Husband further contends that the trial court erred when it ordered Husband to pay 50% of the cost for Child to attend private or parochial school because Wife failed to present evidence of any particular educational needs of Child.

■■■ When reviewing a decision ordering a parent to pay a portion of the cost of private schooling, we consider whether the parent objected to private schooling. If the parent does not object to private schooling, we need not reach the question of whether the educational needs of the child are met by private schooling because we can conclude that the parties agreed on private education. *Engeman v. Engeman,* 123 S.W.3d 227, 239–40 (Mo.App. W.D. 2003).

In this case, the record reveals that, at trial, Dr. Rohen testified about the private school options available in Burr Ridge, Illinois and neither Husband nor his attorney voiced an objection to these private schools or private schooling in general. To the contrary, Husband's attorney rebutted Dr. Rohen's testimony by eliciting Dr. Rohen's admission that excellent private school options existed for Child in St. Louis as well. In light of these circumstances, the trial court justifiably concluded that Husband and Wife both intended private schooling for Child. Point denied.

### D. Division of Marital Debts

■■■ In his fourth point, Husband contends that the trial court erred when it divided Husband and Wife's property and allocated their debts. Husband further asserts that this division and allocation were against the weight of the evidence because Wife voluntarily stopped working after the parties' separation and incurred new debts.

■■■ As a preliminary matter, we note that the division of marital assets and marital debts must be just and equitable. *McGowan v. McGowan,* 43 S.W.3d 857, 867 (Mo.App. E.D.2001). On appeal, we will not disturb the trial court's allocation of debt unless "the division is so heavily weighted against one party as to amount to an abuse of discretion." *Id.* As a result, we defer to the trial court's division of marital debts even if the evidence could support a different conclusion. *Id.*

Husband has failed to overcome the presumption that the trial court's equal allocation of 50% of the debts to Husband and 50% of the debts to Wife was an equitable distribution. Here, the trial court specifically found that both Husband and Wife incurred the marital debts during the course of their marriage. As a result, the trial court's equal division of the martial debts appears more than equitable in light of the trial court's finding that Husband has more than double the earning capacity of Wife.

 Moreover, although Husband is correct that Wife was not working at the time of the trial court's Amended Judgment and accumulated new debts, the trial court was free to view Wife's testimony and explanation for these actions as both credible and warranting an equal division of the parties' debts. We defer to the trial court's superior ability to determine the credibility of witnesses. *Krost,* 133 S.W.3d at 119. Our deferential review of the record indicates that the trial court properly accepted Wife's testimony that she could not find temporary employment during the pendency of the dissolution proceeding because the only dentist positions available in St. Louis were contract positions which would have necessitated a commitment to remain in the St. Louis area. Furthermore, the record clearly indicates that Wife has always been Child's primary caretaker. It is logical, therefore, that since the parties' separation, Wife has accrued reasonable debts in the course of raising the parties' Child. Point denied.

### E. Attorneys' Fees

 In his final point, Husband contends that the trial court erred in ordering Husband to pay $16,000 of Wife's attorneys' fees and costs associated with litigation. The trial court has broad discretion to award attorneys' fees in a dissolution proceeding and the award of attorneys' fees is presumed to be correct on appeal. *Engeman,* 123 S.W.3d at 240. The trial court is "an expert on the necessity, reasonableness and value of [attorneys'] fees." *Taylor v. Taylor,* 25 S.W.3d 634, 648 (Mo.App. W.D.2000) (citation omitted). We presume the award is valid and will only alter it upon a showing of abuse of discretion. *Engeman,* 123 S.W.3d at 240. "To demonstrate an abuse of discretion, the complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary

and unreasonable as to shock one's sense of justice." *Lueckenotte v. Lueckenotte,* 34 S.W.3d 387, 399 (Mo. banc 2001). Husband failed to demonstrate such an abuse of discretion. Point denied.

### *Conclusion*

We reverse and remand to the trial court for the sole purpose of recalculating the amount of retroactive child support Husband owes to Wife based on Husband's income of $3,692 as a plastic surgery resident at Washington University. In all other respects, the Amended Judgment of the trial court is affirmed.

BOOKER T. SHAW, P.J., and LAWRENCE G. CRAHAN, J., concur.