**G.J.R.B., by his Next Friend, R.J.K., and R.J.K., Individually, Petitioners–Respondents,**

v.

**J.K.B., Respondent–Appellant.**

No. 28460.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 14, 2008.

Motion for Rehearing and Transfer Denied
Nov. 3, 2008.

Application for Transfer Denied
Dec. 16, 2008.

Douglas C. Fredrick, Fredrick, Rogers & Vaughn, P.C., Springfield, MO, for Appellant.

Steven Privette, Willow Springs, MO, for Respondent.

GARY W. LYNCH, Chief Judge.

J.K.B. ("Mother") appeals the trial court's judgment awarding R.J.K. ("Father") joint legal and physical custody of the parties' minor child. Mother raises four points on appeal claiming the trial court erred: (1) in adopting a parenting plan in which the custody arrangement automatically modifies upon the child reaching school age; (2) in denying Mother any reimbursement of necessaries; (3) in changing the child's surname to match Father's surname; and (4) in designating Father's residence as that of the child for educational and mailing purposes. We affirm.

### Factual and Procedural Background [1]

■ This Court "defers to the trial court's determination of credibility and views the evidence and permissible inferences in the light most favorable to the decree." *Mund v. Mund*, 7 S.W.3d 401, 403 (Mo. banc 1999) (citing *Mehra v. Mehra*, 819 S.W.2d 351, 353 (Mo. banc 1991)). With that in mind, we recite the following facts developed at trial.

Father and Mother worked together and began seeing each other romantically in June of 2002. Mother informed Father she was pregnant sometime during the Fourth of July weekend that same summer. Initially, Father suggested Mother consider having an abortion, both because he felt he was not ready to have a child

and because he and Mother were not married. Mother refused, and the pair's relationship became strained for a couple of weeks. The two reconciled, however, and a short time later began to plan for the baby and discuss potential names. Mother often brought up marriage, but Father did not want to get married solely because of the baby. About six months into the pregnancy, Mother again broached the subject of marriage, to which Father responded that he wanted to be a part of the baby's life, but still did not want to get married. Father further offered to pay for "half of everything," and reiterated his desire to see the baby and to help Mother raise him. Mother got angry and left, and that was the end of their romantic relationship.

G.J.R.B. ("Child") was born in the early morning hours of April 2, 2003. Although unsure of what to expect, Father went to the hospital later that day to see his son. Mother and her family treated Father respectfully and even took pictures of Father holding Child. Father left for work, but returned to the hospital the next day. This time, Father was told to leave by both Mother and Mother's mother and was threatened with being thrown out. Sometime during the first two weeks of Child's life, Father and his mother went to Mother's home in West Plains to see Child. Father and his mother held Child and played with him for a short time before Mother's friend Sonja arrived. Mother then asked to speak with Father alone, and his mother and Sonja left the house. Once again, Mother asked Father "what

---

1. Rule 84.04(c) requires that an appellant's brief contain a statement of facts that is "a fair and concise statement of the facts relevant to the questions presented for determination without argument." We note with some consternation that Mother failed to comply with this requirement. Her statement of facts is neither fair nor concise, and consists almost entirely of references to her own self-

serving testimony and argument. While failing to comply with the briefing requirements is an appropriate ground for dismissing an appeal, *Shochet v. Allen*, 987 S.W.2d 516, 518 (Mo.App.1999), we decline to do so because this case involves the best interests of a minor child.

All references to rules are to Missouri Court Rules (2007), unless otherwise indicated.

[he] planned to do about the ... baby." Father responded that he still did not want to get married but did want to be a part of Child's life, and again offered to pay for half of Mother's expenses. At that point, Mother got angry and told Father she "didn't want anything from [him], didn't want [him] to ever come back ... didn't need anything from [him], and [Child] didn't need anything from [him]." Father left.

Shortly thereafter, Father asked his mother to help him pick out items to give to Mother and Child, as he was unsure of what things they might need and what size to buy. Because he was wary of how Mother would react if he returned to see Child, Father sent the items—including clothes, diapers, burp cloths, blankets, and rattles—with his mother, who delivered them to Mother.

Upon hearing rumors of Mother's infidelity during their romantic relationship, Father had asked her before Child was born to have Child undergo a paternity test, and she agreed. When Father scheduled the test after Child's birth, however, Mother refused to participate, saying she "absolutely would not have a paternity test done." Because of both his suspicion regarding paternity of Child and Mother's warning to stay away, Father did not attempt to see Child again for quite some time.[2]

Over the course of the next year Mother, Father, and Child crossed paths numerous times, but Mother kept Father and Child apart. Mother would bring Child to work during her maternity leave, or would have Child's babysitter bring him while Mother was working, but Mother would ignore Father, and Father was afraid to approach her. At one point, Mother brought pictures of Child to work with her to show to her coworkers, and specifically instructed them not to show the pictures to Father or tell Father about them. Although he felt unable to approach Mother, Father did drive by her home periodically to make sure she was still living there. Father was fired in September of 2003, and he suspects Mother and her friends were behind it. Shortly after he and Mother stopped seeing each other, Father began seeing another coworker, whom he later married. She, too, was fired.

In the spring of 2004, when Child was a little over one year old, Mother asked Father's mother to watch Child during the day on the weekends, while Mother was at work. This entailed Father's mother driving twenty miles to pick up Child, another twenty miles to bring him back to her home, and then repeating the drive in the evening to drop off Child at Mother's house, for a total of eighty miles per day, twice per weekend. Mother did not pay Father's mother, but she did occasionally pick up Child from her house. Father's mother was happy to see her grandson and to be able to help Mother care for him. As a condition of allowing Father's mother to babysit, however, Mother stipulated that Father's mother could not allow Father to see or speak with Child; if she violated Mother's rule, Mother would stop allowing her and her family to see Child.

Although he had always wanted to see Child, Father was afraid of Mother's reaction since she had told him to stay away, and he was happy that Mother was allowing his mother and the rest of Father's family to get to know Child; he had hoped that Mother would slowly come around to the idea of him getting to know Child, too. So initially, Father abided by Mother's restriction, although he did call his parents

---

**2.** A paternity test showing Father to be Child's biological father was eventually conducted in 2005. Paternity is undisputed in this action.

to ask about Child whenever he knew Child was there; as time wore on, however, Father started visiting with Child during babysitting sessions. Shortly after Child's second birthday in April of 2005, Father and his family threw a birthday party for Child during one of those sessions.

Throughout the time when she was babysitting Child, Father's mother gave Mother various food items harvested from the family farm. Additionally, Father's mother purchased a new washing machine and gave it to Mother when Mother mentioned that her old machine had broken.

Whenever she was around Father's mother, Mother berated Father and expressed her hatred for him. Shortly after Child's birthday in April of 2005, Father's mother responded to Mother's ranting, to the effect of Mother having to "get over" Father and get on with her life. Mother abruptly stopped permitting Father's mother to babysit.

When Mother cut off the rest of his family from seeing Child, Father realized Mother would never voluntarily share Child and filed this paternity action in July 2005. Shortly after filing, Father's mother attempted to visit Mother and Child at Mother's home; when she arrived there, however, Mother was gone, and there was a new owner living in the house.

Once aware that Mother had moved, Father attempted to find her by sending a card to Mother's old home and asking the postal service for a forwarding address. The card came back with an address near Viola, Arkansas, which Father later learned was Sonja's address. Father's mother and some family members followed Sonja's car home one night, and saw Mother's car in the driveway.

After contacting an attorney and filing this suit in July of 2005, Father was told to expect the situation to be resolved by December of that same year. Father had hired a special process server to serve the paternity action on Mother in Arkansas, and the papers were served on Sonja's son, but before they were returned to the court, Mother entered her appearance in this case by her attorney's filing of a motion to dismiss on August 5, 2005.

Meanwhile, shortly after Mother left West Plains and apparently moved in with Sonja in Arkansas, she had Father's mother served with a temporary restraining order. In October of 2005, trial was held in Arkansas, and the temporary order was made permanent. At that trial, Mother testified that she was currently living in Arkansas and planned to stay there and establish residency. The month before, however, Mother had begun looking for a place of her own in Willow Springs, Missouri, and days after testifying at the trial in Arkansas, Mother did, in fact, return to Missouri by moving to Willow Springs. Neither Father nor the court in this case was advised of this move.

When Mother could no longer be located at her Arkansas address and there was no new activity in the lawsuit after Mother filed her motion to dismiss, Father started driving by Sonja's address twice a week to see if he could find either Mother or Sonja. Father did not see anyone at the address until February of 2006, when he saw Sonja's car and a pickup truck in the driveway. A month later, a "For Rent" sign had gone up, and Father did not see anyone at that location thereafter.

Father again tried to find Mother by sending a card to her last-known address, and this time the returned card bore an address in Willow Springs, Missouri. A card sent to that address came back with Mother's parents' address in Springfield. Father also sent a card addressed to Sonja

at the Viola house; that card was returned with an Elizabeth, Arkansas address.

On May 9, 2006, Father was granted a fifty-fifty temporary visitation and custody order, and Mother's attorney was granted leave by the court to withdraw. On May 15, the date the temporary order was to take effect, Father went to the address in Springfield to which Mother's mail was being forwarded, but Mother was not there. Mother's parents, to whom the home belonged, insisted that Mother did not live there, and they did not know where she was. Father tried to involve the police department, but they were unable to help at that time. Father returned to Mother's parents' home every other weekend, in accordance with the court order, looking for Mother and Child. On more than one occasion, both Father and his mother—who often accompanied Father on his trips—were threatened and harassed by Mother's parents.

Father was granted a temporary order by the trial court awarding him full custody on June 29, 2006. That same day, he went to Mother's parents' house to obtain custody of Child, but was again told Mother was not there. Although he called the police department, Father eventually left after waiting approximately three and a half hours, because the police were too busy to respond. Father returned on July 3, and this time brought police with him to the address. Police searched the home but did not find Mother or Child, nor was there any evidence that a child was living there. Two days later, Father filed parental kidnapping charges against Mother in Howell County.

In addition to the above measures taken by Father to find both Mother and Child, Father went to the medical center in West Plains and obtained Child's medical records in the hope of securing a current address. Father also contacted the local Medicaid office, as well as contacting utility companies in both Missouri and Arkansas. Father was unsuccessful in all attempts.

During the time while Mother's location was unknown, she sent two letters to Father's mother: one postmarked from Fort Worth, Texas, and the other from Gainesville, Florida. Mother later admitted at trial to typing these letters and addressing the envelopes, and said that her cousin, a truck driver, mailed them for her. Mother also returned one of the many cards she received from Father and his mother, writing "Return to Sender, Out of Country" on the front of the envelope. At trial, Mother revealed that between March and September of 2006, she and the Child had actually been in Arizona.

In September of 2006, after a new attorney for Mother entered his appearance in this case, the temporary full custody order in Father's favor was vacated. Through his attorney, Father repeatedly attempted to obtain Mother's address but was rebuffed until January of 2007, despite a direct order from the court, as a condition for the vacation of the temporary custody order, that she file written confirmation of her address with the court no later than November 8, 2006.

Father finally met with Mother on November 10, 2006, to discuss a visitation schedule. The meeting was initially set up by Mother's attorney, and the two met at a McDonald's restaurant in West Plains. Although Father was under the impression that Mother was bringing Child with her, she did not do so, and instead presented Father with a typewritten custody and visitation agreement. Mother insisted that Father sign it, or he would not be able to see Child. The parenting plan was heavily skewed in Mother's favor, and Father refused to sign it, pointing out that he had received significantly more parenting time

under the fifty-fifty custody agreement initially ordered by the trial court. Mother got angry and left.

The next meeting was scheduled for November 25, at the same McDonald's in West Plains. Both Father and one of his other children had contracted a stomach virus, and Father did not want to infect Mother or Child, so Father tried to call Mother numerous times before sending his wife in his stead to explain. Mother and Father's wife, rescheduled the visit for December 2, at the Chuck E. Cheese restaurant in Springfield. A snow storm, however, delayed Father and his family, and they arrived just over an hour late. Although short, the visit was successful, as Father and Child ate together and played throughout its duration. At the end of the visit, Father and Mother set up the next one, and agreed to meet at the McDonald's in West Plains the following weekend and to go to a nearby park if weather permitted.

On December 9, Father and his family went to the McDonald's, but Mother and Child never appeared. After waiting over an hour, Father sent a family member to the nearby park just in case Mother had misunderstood the meeting place, but they were not there, either. Father attempted to reach Mother on her cell phone, but she did not answer.

An attempt to schedule a visit for the following weekend was unsuccessful, because Mother refused to return to West Plains. Mother agreed to bring Child back to West Plains on December 23, where they again met at the McDonald's. While Father tried to interact with Child as much as possible, as a three-year-old, Child was more interested in playing in the Playplace, and spent most of the visit in the tubes and play area. Father is physically unable to play in the tubes, as a result of a childhood injury to his hip.

Attempts to voluntarily schedule future visits were ultimately unsuccessful, as Mother once again refused to leave Springfield.

The following month, January 2007, the court ordered that Father be allowed two all-day visits. For the first visit, Father and his wife drove to Mansfield to pick up Child, and, although he was a little hesitant to go with them at first, Child quickly acclimated to his new surroundings and appeared very comfortable with Father and his family. Child did not want to leave Father's home, but willingly went to Mother during the hand-off. The second all-day visit was similarly successful, with Child excited to see Father and reluctant to return to Mother. The victim advocate assigned to the case tried to set up a third all-day visit, but Mother refused.

During one of Child's visits, Child pointed to a picture of Father's mother and Father's brothers and called them "monsters." When Father asked Child what he meant, Child told him that Mother calls Father's family "monsters," and she told him that they "tied him up."

The trial of this case commenced on February 26, 2007. Initially, Father had asked for a declaration of paternity and for the birth certificate to reflect his status as Child's father; for joint legal and physical custody of Child; for a determination of appropriate child support to be paid by Father to Mother, beginning in September of 2005; and for Child's surname to be changed to match his. In his reply to Mother's answer, however, Father changed his request to sole legal and physical custody of Child. He further changed his request for child support, asking that the court determine an appropriate amount of child support to be paid by Mother to Father, as well as award Father attorney fees and costs.

In her answer to Father's initial pleadings, Mother admitted paternity; however, she requested sole legal and physical custody of Child with only supervised, restricted visitation rights to Father. She further requested that Father be ordered to pay child support, as well as reimburse her for necessary expenses incurred while raising Child.

Ultimately, following a three-day trial, the trial court declared Child's paternity in favor of Father; granted joint physical and legal custody to the parties; changed Child's surname to match Father's surname; declared Father's address to be Child's residence for educational and mailing purposes; ordered Mother to pay Father child support upon Child starting school; denied Mother's request for reimbursement of necessaries; and entered a parenting plan which ordered essentially equal parenting time for Mother and Father until Child begins school, at which time Mother's parenting time would consist of the first, second, and forth weekends of each month, the first two weeks of each June, July, and August and alternate holidays. Father's parenting time was designated as all time not specifically assigned to Mother.

On April 10, 2007, Mother filed a motion to reopen the case, and accused Father and his wife of beating Child on two specific occasions. In his response, Father denied beating or even using corporal punishment on Child, and averred that Child actually had bruises on his legs and buttocks when Father picked Child up for the visitation. Father further stated that Child told him that a man living with Mother had inflicted the bruises. At around the same time, Father filed a motion to amend the judgment to include an official "start date" for the parenting plan, as Mother refused to allow Child a two-week period with Father without one.

That motion was granted on May 14, 2007. This appeal followed.

### Standard of Review

In custody cases, "the decision of the trial court will be affirmed unless it is unsupported by substantial evidence, unless it is against the weight of the evidence[,] or unless it erroneously declares or applies the law." *Koenig v. Koenig,* 782 S.W.2d 86, 88 (Mo.App.1989) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)). Further, " '[t]he determination of what is in a child's best interests is a subjective assessment based on the totality of the circumstances[,]' and we review for abuse of discretion." *In re M.L.R.,* 249 S.W.3d 864, 869 (Mo.App.2008) (quoting *In the Interest of A.A.T.N.,* 181 S.W.3d 161, 167 (Mo.App.2005)).

### Discussion

Mother presents four points on appeal, which will be addressed in the order presented.

### Change in Parenting Times When Child Starts School

Mother's first point contends that the trial court erred in entering a judgment that automatically modifies the parenting times in the custody arrangements for the child based solely on a future event, i.e., the child starting school. In particular, Mother argues that in order to modify a custody award, section 452.410 requires a court to find a change in circumstances has arisen, and that modification is in the best interests of the child. That section provides, in relevant part,

[T]he court shall not modify a prior custody decree unless … it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the cir-

cumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child. Section 452.410.1.

As noted by Mother, our courts have interpreted this statute to mean that if an event has not yet occurred and is remote, the court lacks statutory authority to prospectively alter a custody arrangement in a judgment upon the future occurrence of that event in the absence of an intervening modification of that judgment pursuant to section 452.410. *Rice v. Shepard,* 877 S.W.2d 229, 232 (Mo.App.1994) (reversing portion of judgment providing for automatic transfer of custody of the child to mother in the event that mother relocated to Missouri); *see also Shaw v. Shaw,* 951 S.W.2d 746, 750 (Mo.App.1997) (reversing judgment granting mother's relocation to Florida contingent upon success of future visitation); *Burch v. Burch,* 805 S.W.2d 341, 343 (Mo.App.1991) (reversing judgment granting mother physical custody of the child so long as she remains living with her parents).

Also, as cited by Mother, there are many Missouri cases in which clauses automatically modifying custody times upon the occurrence of a future conditional event have been stricken or altered to adhere to this concept. *See, e.g., J.L.S. v. D.K.S.,* 943 S.W.2d 766 (Mo.App.1997) (reversing automatic removal of visitation restriction one year after entry of judgment); *In re Marriage of Dusing,* 654 S.W.2d 938 (Mo.App.1983) (reversing and vacating provisions in judgment automatically changing custody to father if mother moved from county or violated the decree concerning visitation or custody).

All of the cases cited by Mother, however, are true conditional judgments—i.e., judgments for which "enforcement is dependent upon the performance of future acts by a litigant and which is to be annulled if default occurs[.]" *Abbott v. Perez,* 140 S.W.3d 283, 291 (Mo.App.2004) (quoting *Burch,* 805 S.W.2d at 343). As such, they are distinguishable from the case at bar in that here Child is certain, barring some unforeseen circumstance, to begin his formal education as early as within a few months following his fifth birthday. *Abbott,* 140 S.W.3d at 291 (affirming judgment providing for a change in parenting times upon child starting school, when child was three years old at time of judgment); *see also* section 167.031 (mandating compulsory school attendance). At the time of the entry of the judgment in the instant case, Child was just sixteen months away from starting school. Providing for this certain event did not make this a conditional judgment. *Abbott,* 140 S.W.3d at 291. Point one is denied.

### *Reimbursement of Necessaries*

■ In Mother's second point, she contends that the trial court erred in denying her request for reimbursement of necessaries.[3] Mother's argument is without merit.

■ The decision whether to award a party reimbursement for necessary expenses is a matter left to the trial court's discretion and is reviewed only for an abuse of that discretion.[4] *Brown v. Shan-*

---

3. In her argument, Mother complains of the trial court's failure to issue specific findings of fact and conclusions of law on this issue. Notwithstanding the failure to challenge this omission in a point relied on, Mother has not preserved this alleged failure for our review because she did not raise it in a motion to amend the judgment. Rule 78.07(c); *Milone v. Duncan,* 245 S.W.3d 297, 300 (Mo.App. 2008).

4. We note that Mother again failed to adhere to Rule 84.04 when she omitted the pertinent standard of review from this section of her

*nahan,* 141 S.W.3d 77, 81 (Mo.App.2004) (citing *M.B., by and through P.B. v. J.N.,* 926 S.W.2d 929, 930 (Mo.App.1996)).

■ Mother argues that the trial court used the wrong standard when it denied her any reimbursement for expenses during the first few years of Child's life; according to Mother, instead of determining whether Mother's request was supported by substantial evidence and not against the weight of the evidence, the trial court found that any reimbursement was unjust and unreasonable under the circumstances. The entirety of Mother's argument consists of an attempt to demonstrate that the proof she offered at trial has been held to be sufficient in other cases where some reimbursement was ordered. Such an argument does not comport with our abuse-of-discretion standard of review.

■ "An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances and is sufficiently arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *In re Marriage of Michel,* 142 S.W.3d 912, 917–18 (Mo.App.2004) (citing *Wright v. Wright,* 1 S.W.3d 52, 57 (Mo.App.1999)). "If reasonable minds can differ about the propriety of the trial court's ruling, there was no abuse of discretion." *Michel,* 142 S.W.3d at 918 (citing *Hatchette v. Hatchette,* 57 S.W.3d 884, 888 (Mo.App.2001)). We are, therefore, not permitted to substitute our judgment for that of the trial court, but must abide by its decision so long as reasonable minds might differ about the propriety of its ruling.

While Mother is correct in noting that presenting the court with a list of items and their estimated cost—which, in this case, she either retrieved from memory or found at the local Wal–Mart while compiling the list—and testifying to that list at trial, has been upheld as a method of determining reimbursement of necessaries, *see Babb v. Pfuehler,* 944 S.W.2d 331, 337 (Mo.App.1997), she conveniently elides both the relevant statutory language and the rest of the evidence before the trial court. The applicable statute reads: "The court may limit the father's liability for past support of the child to the proportion of the expenses already incurred *that the court deems just.*" Section 210.841.4[5] (emphasis added).

The evidence, viewed in the light most favorable to the judgment, indicates that from before Child's birth, Mother not only rebuffed Father's attempts to contribute financially, but shortly after Child's birth affirmatively asserted that she did not want any financial assistance from Father. Beginning on the second day of Child's life, Mother continually took actions and steps designed to exclude Father from contact with Child and to penalize Father if he attempted to have any such contact. When those efforts did not succeed, Mother covertly removed herself and Child to Arkansas in an effort to frustrate Father's contact with Child. When Father located her and Child in Arkansas, Mother again covertly moved herself and Child to Willow Springs, Missouri, and then to Arizona, employing nefarious means to misdirect

brief. Rule 84.04(e) requires that an appellant's argument "include a concise statement of the applicable standard of review for each claim of error." Rule 84.04(e). Although Mother cursorily mentions in the final paragraph of her argument on this point that the court's decision "constitutes an abuse of discretion," she makes no attempt to otherwise elaborate or explicate this statement in her argument, nor does she make clear that abuse of discretion is the correct standard for this Court to apply.

5. All statutory references are to RSMo 2000, unless otherwise specified.

Father from locating her and Child, including intentionally having letters sent to Father bearing postmarks from other states and having a card returned to Father with an indication that Mother and Child had moved out of the country. When she returned from Arizona in September 2006, she secreted her and the Child's residence from Father until January 2007, even in the face of a court order requiring her to disclose it to Father and the court by no later than November 8, 2006. All moves subsequent to her initial move to Arkansas occurred after Father had filed this action and Mother had become well aware that Father was seeking to be involved in Child's life because she had entered her appearance in this action by filing her motion to dismiss on August 5, 2005.

After more than sixteen months of intentionally hiding her and Child's whereabouts from Father, including a period of at least three months in Arkansas and six months in Arizona, it was only within the four months immediately preceding trial that Mother attempted to put on the appearance of allowing contact by Father with Child. Mother's actions during that time period, however, actually impeded, restricted, and attempted to frustrate any such contact, and after the expiration of the two court-mandated visitations, Mother refused any other pre-trial visitation.

In a case with strikingly similar facts, the Eastern District of our court, in *Brown v. Shannahan, supra,* found no abuse of discretion in the trial court's denial of reimbursement for necessaries to a mother. 141 S.W.3d at 81. In that case, the mother left the state with the child and left the father with no information as to their whereabouts. *Id.* The mother made every effort to thwart the father's relationship with the child, preventing the father from seeing the child for fourteen months.

*Id.* at 81–82. The mother had also disregarded several court orders. *Id.* at 82.

Here, the trial court concluded that, after weighing all factors, it was not "just" to order Father to reimburse Mother for any portion of the Child's expenses already incurred by Mother during a time period when Mother was actively and effectively denying any contact or relationship between Father and Child. *See* Section 210.841.4. This decision is not only in accord with the facts in the Eastern District's decision in *Brown,* but is also supported by an additional fact not present in *Brown.* Here, Mother explicitly refused any financial support from Father during a time period when she thought she could unilaterally deny Father contact with Child and then reversed her position to request reimbursement for that time period in order to penalize Father for seeking to legally enforce such contact. While some, including Mother, may disagree with the trial court's conclusion in this case and with the Eastern District's conclusion in *Brown,* we are not prepared to say that the trial court here, the trial court in *Brown,* and the panel on the Eastern District in *Brown* all have unreasonable minds. The decision in *Brown* supports at a minimum the proposition that reasonable minds can differ in this situation and, thus, we cannot find that the trial court's decision is clearly against the logic of the circumstances or is sufficiently arbitrary and unreasonable as to shock the sense of justice or indicate a lack of careful consideration, i.e., an abuse of discretion. Point two is denied.

### Change of Child's Surname

■ Mother's third point alleges that the trial court erred in changing Child's surname to match Father's surname, because Father did not present sufficient evidence to warrant the name change.[6]

---

**6.** Mother filed a motion to dismiss Father's    brief or in the alternative to strike his plead-

"Neither parent has the absolute right to confer his or her name upon the child." *Brown*, 141 S.W.3d at 82. The trial court "has wide discretion with regard to changes of surname in paternity actions and should be guided by what is in the best interests of the child in determining the appropriate surname." *Wright v. Buttercase ex rel. Buttercase*, 244 S.W.3d 174, 177 (Mo.App.2008). This Court will affirm the decision of the lower court "unless it is 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration' " on the part of the trial court. *Id.* (quoting *Morris by Cope v. Morris*, 926 S.W.2d 87, 89 (Mo.App.1996)).

The burden of proving to the court that the desired name change is in the child's best interests rests with the parent seeking to change the child's name. *Brown*, 141 S.W.3d at 82. "A mere statement by a parent that he or she would like for the child's surname to match his or her own is not sufficient to overcome that burden." *Blechle v. Poirrier*, 110 S.W.3d 853, 855 (Mo.App.2003). In determining whether changing a child's surname is in the child's best interests, certain factors are considered by the court, including "the child's age, the potential embarrassment or discomfort the child would experience when his or her surname is different than the custodial parent, and how the name change will affect the child's relationship with his parents." *R.K.T.S. by V.T. v. R.S.*, 819 S.W.2d 749, 750 (Mo.App.1991). Mother contends that the entirety of Father's evidence on this point consisted of his own statement that he desired Child's last name to be changed to match his. We disagree.

Again, this Court is required to view the evidence presented at trial in the light most favorable to the outcome below, and to draw all reasonable inferences in the same manner. *Mund*, 7 S.W.3d at 403. The trial court had ample evidence before it to justify changing Child's surname, beyond Father's express statement that he wanted such a change. Child was not yet four years old at the time of trial, and was not yet enrolled in school. While he would identify himself using Mother's surname when asked, Child also recognized Father as his father and seemed to understand the familial relationship that existed whenever Child visited Father and other family members. As it was Father's address that was designated as Child's for educational purposes, there is potential for confusion should Child be enrolled with a last name different than Father's. Further, everyone in Father's household—including all of Child's known siblings [7]—shared Father's surname. The trial court clearly believed that Father had been trying to establish a parental relationship with Child from the beginning, and changing Child's surname to match Father's would only serve to strengthen that relationship. Finally, Mother testified that she is in a committed relationship; if Mother does marry and take her husband's surname, Child would

---

ings for, *inter alia*, including and arguing certain facts in his brief on appeal pertaining to this issue that were allegedly not supported by the record. While we note the importance of accurately reflecting the record on appeal, we overrule Mother's motion because the alleged misstatements were more in the nature of drawing reasonable inferences from the facts in the record and were not in any way misleading.

7. The evidence disclosed that Father's current wife's surname is the same as his surname and that all of the children born to her and Father were born during their marriage. Even though their children were only referred to by their first names in the record, a reasonable inference from the record supports that their surname is the same as Father's.

then have a different surname than *both* his parents. This Court has upheld surname changes based on less evidence than presented in this case. *See Cobb by Webb v. Cobb,* 844 S.W.2d 7, 9 (Mo.App.1992). Faced with such evidence, it was not an abuse of the court's discretion to determine that changing Child's surname to that of Father was in Child's best interests. Mother's third point is denied.

### Designation of Father's Address for Educational and Mailing Purposes

Mother's fourth point contends that the trial court erred in designating Father's address for educational and mailing purposes because the decision was against the weight of the evidence and was not in the best interests of Child.

Unfortunately, Mother fails to develop any argument whatsoever in the argument portion of her brief pertaining to the trial court's ruling challenged in her point relied on. In fact, the designation of Father's address for educational and mailing purposes is never mentioned in the argument portion of Mother's brief on this point. "Any claim of error raised in a point relied on which is not addressed in the appellant's argument is deemed waived." *Cohen v. Cohen,* 73 S.W.3d 39, 52 (Mo.App.2002).

Mother's argument under this point focuses entirely on the parenting times assigned to each party in the court's parenting plan and the court's alleged failure to assign more time to Mother and less time to Father. The assignment of parenting time, however, is an issue separate and distinct from the designation of an address for educational and mailing purposes as required by section 452.375.5(1). *Loumiet v. Loumiet,* 103 S.W.3d 332, 339 (Mo.App.2003). Rule 84.04(e) requires that "[t]he argument be limited to those errors included in the 'Point Relied On.'" Rule 84.04(e); *MacDonald v. Minton,* 142 S.W.3d 247, 252 (Mo.App.2004). Thus, issues which are only addressed in the argument portion of an appellant's brief and not presented in a point relied on are not presented for appellate review.[8] *In re Marriage of Flud,* 926 S.W.2d 201, 206 (Mo.App.1996). Mother's fourth point is dismissed.

### Decision

The trial court's judgment is affirmed.

BARNEY, P.J., and RAHMEYER, J., concur.

---

8. Mother attempted to alter her point relied on in her reply brief, in order to conform to her previously submitted argument. This, too, is not allowed. Rule 84.04(g); *Coyne v. Coyne,* 17 S.W.3d 904, 906 (Mo.App.2000).