

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

JODY S. EICHACKER,

    Respondent,

vs.

RICHARD F. EICHACKER,

    Appellant.

)
)
)
)
)
)
)
)
)
)
)

No. ED106976

Appeal from the Circuit Court of
of St. Louis County
13SL-DR03268-02

Honorable John R. Essner

Filed: February 25, 2020

## OPINION

Richard Eichacker ("Father") appeals the trial court's judgment modifying the original decree dissolving his marriage with Judy Eichacker ("Mother"). In six points relied on, Father claims the trial court erred (1) by excluding the testimony of Father's expert witness regarding the employability and emancipation for child support purposes of the parties' adult son B.R.; (2) by denying Father a credit for a $16,710 overpayment in child support on the basis that the overpayment was voluntary; (3) by failing to appoint a guardian ad litem *sua sponte*; (4) by including $960 per month for uninsured medical expenses in the new presumed child support amount ("PCSA"); (5) by failing to impute income to Mother after she retired from her teaching job; and (6) by awarding $25,000 in attorney's fees on appeal to Mother.

As to Point I, which addresses the court's exclusion of the testimony of Father's expert witness, we find the court erred, but pursuant to Rule 84.14, we reach the same conclusion as the

trial court that B.R. is not employable and therefore should not be emancipated for child support purposes at this time. We affirm as to Points III, IV, V, and VI and affirm Point II as modified.

## Facts and Background

The parties' original dissolution decree entered on June 20, 2015, and amended on October 11, 2015, awarded Mother and Father joint legal and physical custody of the parties' children B.R. and J.M. and provided Father visitation with B.R. and J.M. on Wednesday evenings and alternating weekends.

On April 12, 2016, Mother filed her motion to modify the original judgment under § 452.340.2[1] to extend the age of emancipation[2] for both B.R. and J.M. because they both suffer from multiple psychological and emotional diagnoses which render them unable to support themselves past the legal age of emancipation. Father moved to terminate child support as to B.R. since he had reached the age of emancipation. Mother also filed a motion to determine sums due and for contempt regarding Father's failure to pay child support and certain uninsured medical expenses.

These issues were tried on March 27 and 28, 2018. On the question whether B.R. should be emancipated, the court heard testimony from Mother's experts, clinical psychiatrist Dr. Darrin Friesen and licensed vocational rehabilitation counselor Timothy Kaver, as well as from Mother and Father. Their testimony addressed whether B.R. was able to obtain and maintain employment. Mother and Mother's experts testified generally that B.R. was not employable while Father testified that B.R. was employable. Father's expert, clinical psychologist Dr. Sharon Lightfoot,

---

[1] All statutory references are to RSMo 2012 unless otherwise indicated.
[2] Section 452.340 provides that a parent's obligation to pay child support ordinarily terminates when the child reaches the age of eighteen. However, "[i]f the child is physically or mentally incapacitated from supporting himself and insolvent and unmarried, the court may extend the parental support obligation past the child's eighteenth birthday." § 452.340.4.

2

also testified on the employability issue, but the court struck her testimony ruling that Dr. Lightfoot was not qualified to testify about B.R.'s employability.

On May 7, 2018, the trial court entered its modified judgment in which it granted Mother's motion to extend the emancipation of both B.R. and J.M. so long as they remain enrolled in and attending an institution of vocational or higher education, and continue to meet the other requirements of § 452.340.5.[3] The court also ordered Father to pay Mother (1) $2,045 per month in retroactive child support for the period of May 1, 2016 to March 31, 2018, less all amounts paid; (2) $2,619 per month in child support from April 1, 2018 through the present and into the future, but in the event one of the children becomes emancipated, then the sum of $2,164 per month; (3) a lump sum of $4,974 for uninsured medical expenses incurred by Mother from the date of the original judgment through March 31, 2018; and (4) $10,000 for attorney's fees incurred in the trial court.

After Father filed his notice of appeal of the foregoing judgment, Mother filed a motion for attorney's fees incurred *on appeal* which the trial court granted ordering Father to pay $25,000 for Mother's attorney's fees on appeal. Father appealed that judgment as well and both appeals have been consolidated here.

---

[3] Per § 452.340.5, a child who is eligible for continued support and enrolled in and attending an institution of vocational or higher education will remain eligible so long as the child at the beginning of each semester submits to each parent (1) a transcript or similar document from the institution which lists the courses the child is currently enrolled in as well as those he has already completed and the grades and credits received for each, and (2) an additional document from the institution which lists the courses the child is enrolled in for the upcoming term and the number of credits for each. If at the end of the semester the noncustodial parent requests notification of the child's grades, the child must produce the required documents within thirty days of receiving those grades from the institution. These requirements apply whether the child is enrolled in the minimum twelve credit hours per semester or whether he is enrolled in less than twelve credit hours due to his diagnosed condition, as is the case here.

**Standard of Review**

In a court-tried case, we affirm the judgment below if it is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law. *In the matter of S.J.M.*, 453 S.W.3d 340, 342 (Mo.App.E.D. 2015) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976)). We view the evidence in the light most favorable to the trial court's judgment, disregarding all contrary inferences and evidence. *Id.* at 342-43.

**Discussion**

I.     The trial court's exclusion of Dr. Lightfoot's expert testimony regarding B.R.'s employability and emancipation.

By striking Dr. Lightfoot's testimony on the threshold basis that she was not licensed as a vocational rehabilitation counselor, the trial court misinterpreted Missouri's expert witness statute, § 490.065 and, therefore, erred as a matter of law. Nevertheless, since this was a court-tried case, we have the authority under Rule 84.14 and applicable case law to consider that erroneously excluded testimony and to render the appropriate judgment. *Lan Near v. CitiMortgage, Inc.*, 484 S.W.3d 372, 375 (Mo.App.E.D. 2016). And, after reviewing Dr. Lightfoot's testimony together with the other testimony in the record regarding B.R.'s employability and emancipation, we reach the same conclusion as the trial court—that B.R. is not yet employable and therefore should not be emancipated at this time for child support purposes.

Missouri's expert witness statute, § 490.065, provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by skill, knowledge, experience, training, *or* education may testify thereto in the form of an opinion or otherwise." (Emphasis added). Thus, an expert witness may be qualified on foundations other than the expert's education or licensure. *Johnson v. State*, 58 S.W.3d 496, 499 (Mo.banc 2001) (quoting *Landers v. Chrysler Corp.*, 963

4

S.W.2d 275, 281 (Mo.App.E.D. 1997). For example, substantial practical experience in the area in which the expert is testifying is a permissible source of expertise. *Donjon v. Black & Decker (U.S.), Inc.*, 825 S.W.2d 31, 33 (Mo.App.E.D. 1992).

The decision whether a witness qualifies as an expert and whether that testimony will assist the trier of fact is a matter within the trial court's discretion, and it will not be disturbed upon appeal absent an abuse of that discretion. *Whitnell v. State*, 129 S.W.3d 409, 413-14 (Mo.App.E.D. 2004). However, where the trial court misapplies the law resulting in the improper exclusion of evidence, we will find an abuse of discretion. *State v. Roux*, 554 S.W.3d 416, 418 (Mo.App.S.D. 2017).

So, while it would have been proper for the trial court here to *consider* that Dr. Lightfoot did not have a particular license or certification, it is error under § 490.065 to exclude her testimony on that threshold basis alone. As long as an expert is qualified on some basis set forth in § 490.065, whether or not the expert possesses a particular certification or licensure goes to the credibility and weight of the testimony, not its admissibility. *See Matter of Brown v. State*, 519 S.W.3d 848, 861 (Mo.App.W.D. 2017).

The record here is replete with evidence of Dr. Lightfoot's practical experience in employability determinations that would qualify her as an expert on that subject. In particular, Dr. Lightfoot has a Ph.D. in psychology, is licensed as a clinical psychologist by the State of Missouri, and has been practicing in that field for the last thirty years. Earlier in her career, she worked for the U.S. Department of Veterans Affairs where she became certified to conduct disability determination evaluations, which unequivocally involved making decisions about whether or not an individual was able to maintain employment. Currently, in her ongoing private practice, Dr. Lightfoot conducts disability determination evaluations for the Social Security Administration in which she is called upon to decide whether or not someone is eligible for benefits based upon their

employability. Also in her private practice, Dr. Lightfoot frequently assists adults with emotional or other issues in seeking disability benefits as a result of their inability to work.

The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317 (Mo.App.E.D. 2018). Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Id.* at 318 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (Mo. 1993)). Thus, while the court was free to consider that Dr. Lightfoot did not possess the certification as a vocational rehabilitation counselor in its evaluation of Dr. Lightfoot's opinion, it erred as a matter of law by excluding her testimony on that threshold basis alone.

But since this was a court-tried case, we are not required to reverse. Prejudicial or reversible error in the admission or rejection of evidence is not the issue on appeal in any case tried to the court without a jury. *Lan Near*, 484 S.W.3d at 374 (citing *City of Town & Country v. St. Louis County*, 657 S.W.2d 598, 608 (Mo.banc 1983)). Rather, the issue is whether the contested evidence should have been admitted and considered, or rejected and not considered, and then "what the judgment of the court should be, based on a consideration of the competent and admissible evidence." *Lan Near*, 484 S.W.3d at 375 (quoting *Thau–Nolde, Inc. v. Krause Dental Supply & Gold Co.*, 518 S.W.2d 5, 9 (Mo. 1974)); *see also* Rule 84.14 ("The appellate court shall award a new trial or partial trial, reverse or affirm the judgment or order of the trial court, in whole or in part, *or give such judgment as the court ought to give*. Unless justice otherwise requires, the court shall dispose finally of the case." (Emphasis added)).

Since the issue critical to B.R.'s emancipation was whether he could obtain and maintain employment and we have held that the trial court erred in excluding Dr. Lightfoot's expert

6

testimony on that issue, we may, under the foregoing authority, review the testimony on B.R.'s employability, including that of Dr. Lightfoot, and render the appropriate judgment.

Turning now to our consideration of that testimony, we find that the evidence supports the conclusion that B.R. is not yet employable and therefore should not be emancipated for child support purposes at this time. B.R.'s treating psychiatrist Dr. Darrin Friesen opined that B.R. is currently unable to maintain employment due to his behavioral and learning disabilities. Dr. Friesen testified that B.R.'s disabilities impair his capacity to communicate appropriately in social situations and affect his work performance in the classroom (e.g., his ability to focus, control impulse, and complete tasks); that B.R. has difficulty independently securing and administering his medications as prescribed, which presents a high risk for suicide; and that B.R. struggles to maintain a regular 12-credit-hour school schedule without Mother's direct and continuous assistance. Dr. Friesen also testified that he does not expect there to be any significant improvement in B.R.'s condition for the next several years. According to Dr. Friesen, although it is possible that B.R. is capable of performing a part-time job, he certainly does not have the capacity to obtain and maintain full-time employment.

Vocational rehabilitation expert Timothy Kaver, who conducted a personal interview with B.R., testified that during the interview B.R. had extreme difficulty engaging in active conversation—noting that B.R. frequently veered away from the questions that were asked of him which required repeated intervention by Mother in order to keep the interview progressing. Mr. Kaver testified that B.R.'s current diagnoses will most likely prevent him from obtaining and maintaining any employment. Specifically, he asserted that B.R.'s previous part-time employment was "unsuccessful" because he had difficulty showing up for his shift, being on time, and interacting with customers or other co-workers in an appropriate manner. Mr. Kaver opined that

7

due to the challenges associated with B.R.'s combination of diagnoses, it would be "miraculous" for B.R. to obtain and maintain even a part-time job. Finally, although Mr. Kaver conceded that B.R. possesses physical skills which could help him achieve employment, he distinguished between possessing those skills and maintaining a job.

Mother testified that B.R. had difficulty performing daily activities such as waking up on time for school, taking his medications as prescribed, and practicing personal hygiene. Mother also testified regarding B.R.'s dynamic mood swings, his resistance to taking prescribed medications and the detrimental effects this has on his behavior, and the extent of B.R.'s difficult relationship with his brother J.M.

Father, for his part, testified he believed B.R. to be employable based entirely on videos he saw of B.R.'s welding projects. Nevertheless, Father admitted he has not spent any measurable time with B.R. in the past several years, and although Father asserted his willingness to help B.R. apply for employment, he has yet to do so. Like the trial court, we are not persuaded by Father's testimony.

Finally, we reviewed the testimony of Father's expert, Dr. Lightfoot. She opined that B.R. is employable based on his success in attending junior college, his ability to work summer jobs, his improvement in attendance and performance at school and work, his increased ability to identify his strengths and weaknesses, and his willingness to participate in psychotherapy. However, even though Dr. Lightfoot identified some improvement in B.R.'s behavior in recent years, we do not agree, in light of B.R.'s significant diagnoses together with the expert testimony of Dr. Friesen and Mr. Kaver, and Mother's testimony, that B.R. possesses the level of functioning necessary to obtain and maintain gainful employment at this time.

8

Thus, after considering all of the aforementioned testimony, we find that B.R. is not yet employable and therefore the child support attributable to him should not be terminated at this time. Likewise, the court's judgment extending the emancipation of J.M. was not appealed by Father and therefore represents a final judgment on that issue.

II.  Father's claim to a credit for the $16,710 he overpaid in child support.

We now turn to Father's claim that he is entitled to a credit for his child support overpayment of $16,710 against the child support obligations ordered by the trial court in its modified judgment. The trial court denied Father's claim reasoning that Father was not entitled to a credit against his *future* child support obligations because the overpayment was voluntary and Missouri law does not permit a credit against *future* child support when the overpayment has been made voluntarily. The court also rejected Father's claim to a credit against the *retroactive* child support ordered by the court.

The trial court was correct that Father is not entitled under Missouri law to a credit against his *future* child support obligations because his overpayment was voluntary. However, we find that the trial court erred in denying Father a credit for at least a portion of the $16,710 overpayment against the *retroactive* child support ordered in its modified judgment.

Missouri law treats the question of a party's entitlement to a credit for child support overpayments differently depending on whether the party is seeking a credit against *future* as opposed to *retroactive* child support obligations. The general rule is that a party who overpays child support may not claim those payments as a credit against *future* child support obligations if the overpayment was voluntarily made. *Carey v. Carey*, 84 S.W.3d 469, 473 (Mo.App.E.D. 2002). But a party *is* entitled to a credit against *retroactive* child support obligations for overpayments

9

made between the time of separation and the time of trial, even if the overpayments are found to be voluntary. *Foraker v. Foraker*, 133 S.W.3d 84, 99 (Mo.App.W.D. 2004).

> A. *Father is not entitled to a credit against his future child support obligations.*

We first analyze Father's claim to a credit as to his *future* child support obligations and find that the trial court was correct to deny such a credit based on its finding that Father's overpayment was voluntary. In Missouri, an overpayment is presumed voluntary and may not be credited against future support obligations unless the parties have agreed to such an arrangement or when other equitable considerations exist. *Sample v. Krouts*, 954 S.W.2d 593, 600 (Mo.App.W.D. 1997). Father has the burden of overcoming the presumption of voluntariness. *Id.* at 601.

Father argues that his overpayment of child support was not voluntary because the payments were made pursuant to a mandatory court-ordered income withholding.[4] While we agree that the income withholding order caused Father to pay more than he owed each month in child support, we disagree that the mandatory nature of the order is sufficient on its own to overcome the presumption of voluntariness. The record here demonstrates that after Father's child support arrearage had been satisfied through the payments made pursuant to the income withholding order, Father became aware that the continuation of the income withholding order was resulting in a steadily-increasing overpayment of child support that ultimately amounted to the sum of $16,710. Yet, from December 2015 when his overpayments began through the time of trial in March 2018,

---

[4] Father also argues that by including the overpayment in its calculation of the appeal bond, the trial court acknowledged and effectively held that his overpayment was not voluntary. We are unpersuaded by this argument and Father has failed to cite to any authority that the court's calculation process for an appeal bond is relevant to whether a party's overpayment of child support is voluntary or not.

10

Father failed to bring this issue before the court or to take any rectifying action. Therefore, it was reasonable for the trial court to infer that Father voluntarily overpaid child support.

Accordingly, the trial court did not err in rejecting Father's request that his overpayment of child support be credited against any future child support payments including the uninsured medical expenses the trial court has ordered him to pay.

B.     Father *is* entitled to at least a partial credit against his *retroactive* child support obligations.

We turn now to Father's claim that the trial court erred when it held that he was not entitled to a credit for his $16,710 overpayment against the *retroactive* child support ordered by the trial court. We find that Father is entitled to at least a partial credit based on two reasons:  (1) the trial court specifically ordered that the amounts Father already paid should be deducted from the retroactive child support amount, and (2) under Missouri law a party ordered to pay retroactive support is generally entitled to receive a credit for voluntary child support overpayments. *See, e.g., Runge v. Runge*, 103 S.W.3d 804, 807 (Mo.App.E.D. 2003) ("The party ordered to pay retroactive support is entitled to receive credit for voluntary amounts paid to the child between the time of separation and the time of trial.").

The plain language of the trial court's judgment orders Father to pay *retroactive* child support for a twenty-three month period from May 1, 2016 through March 31, 2018 in the amount of $2,045 per month for a total of $47,035 and grants Father a credit for the amounts he already paid:  "[Father] shall pay to [Mother] retroactive child support in the amount of $2,045 from May 1, 2016 to March 31, 2018, less all amounts paid."  Since we are required to give plain and unambiguous words employed in a judgment their literal meaning, we find that the phrase "less all amounts paid" refers to the amounts Father paid during the same period of time the court ordered

11

retroactive child support to be paid.[5] Moreover, the trial court drew no distinction between the amounts paid that were owed and the amounts paid that represented an overpayment. The trial court simply stated: "less all amounts paid."

The record demonstrates that Father paid $41,746 from May 1, 2016 through March 31, 2018. This amount includes $14,008 of the $16,710 overpayment for which he seeks to be credited. Based on the language of the judgment, we find that Father is entitled to a credit for this $41,746 against the $47,035 in retroactive child support.

In addition, since the court-ordered retroactive child support began on May 1, 2016 but Father made an overpayment of $232 before May 1, 2016 but after he was served on April 12, 2016 with Mother's motion to modify, we hold that Father is entitled to an additional credit of $232. *Mitalovich v. Toomey*, 206 S.W.3d 361, 365 (Mo.App.E.D. 2006) (holding that a party is entitled to a credit against retroactive child support for those amounts he voluntarily paid during the pendency of the action); § 452.370.6 ("The order may be modified only as to support or maintenance installments which accrued subsequent to the date of personal service."); *Fulton v. Adams*, 924 S.W.2d 548, 553 (Mo.App.W.D. 1996) ("A trial court has no authority to modify child support retroactive to a date before the filing of the motion to modify and service of summons.").

As to the remaining portion of the overpayment – $2,470 – for which Father seeks to be credited, we find that he is not entitled to that amount as a credit because that overpayment occurred prior to the service upon him of the motion to modify. *Id.* So, after application of the

---

[5] The general rules of construction for written instruments are used to construe court judgments. *Dover v. Dover*, 930 S.W.2d 491, 495 (Mo.App.W.D. 1996). If possible, judgments should be construed in a way that will make them effective. *Id.* But when the language of the judgment is plain and unambiguous, there is no room for construction or interpretation, and the effect thereof must be declared in the light of the literal meaning of the language used. *Id.*

credits of $41,746 and $232 to the $47,035 in retroactive child support ordered by the trial court, Father's retroactive child support obligation is $5,057.

Accordingly, the court's judgment stands modified to reflect that Father shall pay Mother $5,057 in retroactive child support.

III. The trial court did not err by failing to appoint a guardian ad litem *sua sponte* after it heard evidence at trial that Mother used mace on their son J.M.

Section 452.423 mandates the appointment of a guardian ad litem in any proceeding in which child abuse or neglect is alleged. Even when neither party has alleged abuse or neglect in their pleadings, if the evidence at trial establishes a sufficient level of abuse or neglect, the court must appoint a guardian ad litem *sua sponte*. *Landwehr v. Landwehr*, 442 S.W.3d 139, 140-41 (Mo.App.E.D. 2014).

While we acknowledge that spraying a child with mace *could* constitute abuse under § 210.110,[6] Father's argument regarding the alleged abuse ignores significant surrounding circumstances which the court contemplated. Specifically, the trial court heard ample evidence of J.M.'s violent behavior toward Mother. When asked at trial about specific instances of violence that have occurred between her and J.M. since the divorce, Mother testified:

> Um, it's screaming, kicking, biting, punching. He will drag me off my bed, if I don't respond to him wherever I am sitting. He wants me to do something, and I am telling him no, [J.M.], we are not going to do that, he will grab me by the leg. If you grab me by one leg, I can fall on my second leg, if he pulls me off with both legs, I fall on my back side. He blocks me into the kitchen cupboards. Gets right up in my face and screams at me. Pushes me. He's football-tackled, like put your head down and run and tackle me. Biting. Scratching. Pulls my hair. Pulled me by my hair. Pulled me out of the car by my hair.
> Last night he took the steering wheel out of my arms, and pulled it to one side so that I – because he wanted me to go one way, go a particular direction, so I was trying to

---

[6] "Abuse" is defined as "any physical injury, sexual abuse, or emotional abuse inflicted on a child other than by accidental means by those responsible for the child's care, custody, and control, except that discipline including spanking, administered in a reasonable manner, shall not be construed to be abuse."

13

drive straight, and he is trying to pull, so you know, he has got both hands, I can't even get the wheel to come back to straight, let alone move, you know, I just put on the brakes and stopped where I was . . . . So I sat blocking traffic with my foot on the brake, because he had control of the steering wheel.

He will reach over and punch me like that while I am driving. Take the car out of gear. Pull the emergency brake up while I am driving. I am sorry, I am shaking [just talking about it].

The court also heard evidence of measures Mother has taken to protect herself from J.M.'s violent behavior including spraying him with water, walking away, locking herself in her room, and in the event that any of those fail, using mace. During her testimony, Mother described the most recent incident in which she used mace to protect herself from J.M. after he backed her into a corner in his room and punched her.

We are unpersuaded that Father established as a matter of law that Mother's use of mace was child abuse and not some form of permissible discipline or self-defense. Based on the evidence presented at trial, it was reasonable for the court to conclude that Mother—wary of her teenaged son who suffers from multiple emotional and psychiatric diagnoses—used mace against him to defend herself. Adhering to *Landwehr*'s holding that a guardian ad litem must be appointed in any child custody proceeding where child abuse or neglect is alleged, we hold that Father failed to establish here that Mother's conduct was child abuse within the meaning of § 452.423. As a result, Point III is denied.

IV.    The trial court did not err by including $960 per month for uninsured medical expenses in the new PCSA.

For this point, Father argues that the trial court erred by including $960 per month for uninsured medical expenses in the new PCSA because there was not substantial evidence of changed circumstances in the record to allow the court to modify child support, and alternatively, there was not substantial evidentiary support to include that amount in the PCSA for uninsured medical expenses.

14

*A. There was substantial evidence of changed circumstances to allow the court to modify child support.*

We first address whether the court was permitted from a procedural standpoint to modify the child support award. Section 452.370.1 states: "the provisions of any judgment respecting maintenance or support may be modified only upon a showing of changed circumstances so substantial and continuing as to make the terms [of the original award] unreasonable."

The decision to modify a child support award lies within the discretion of the trial court and will only be reversed if there is an abuse of discretion or misapplication of the law. *Selby v. Smith*, 193 S.W.3d 819, 824 (Mo.App.S.D. 2006). Here, we find that the trial court properly modified the award based on a series of changed circumstances that were evident in the record. Specifically, Mother's retirement from her school-teaching career resulted in a substantial decrease in Mother's monthly income and an increase in her health insurance premiums. Moreover, Father's monthly income increased significantly since the time of dissolution, and Father had failed to exercise *any* custody time with B.R. or J.M. since the original judgment was entered. Since the trial court could have found these changes to be substantial and continuing in nature, we find the court was justified in modifying child support here.

*B. There was substantial evidentiary support to include $960 per month as the amount for uninsured medical expenses in the PCSA.*

The question remains whether the trial court correctly calculated the PCSA under Civil Procedure Form 14 ("Form 14") by including $960 per month for uninsured medical expenses. In determining the PCSA, the trial court is guided by Form 14's directions for completion and comments on use, and by the evidence in the case. *McCandless-Glimcher v. Glimcher*, 73 S.W.3d 68, 73 (Mo.App.W.D. 2002). An award of child support is within the sound discretion of the trial

court, and we will not disturb the award unless the evidence is palpably insufficient to support it. *Bearce v. Lewey*, 182 S.W.3d 737, 745 (Mo.App.W.D. 2006).

Here, the record establishes that there were significant medical expenses on an ongoing basis for B.R.'s and J.M.'s medical treatment, that some of those expenses were not covered by the parties' insurance policies, that Mother bore almost the entire burden of dealing with the providers and insurance companies, and that Father frequently failed to cooperate or assist Mother in securing reimbursements from his own insurance company and, in some instances, withheld his own reimbursements owed to Mother.

As to the amount ordered, the court found Mother's testimony credible that the average monthly total of uninsured medical expenses for both boys was $960. A party's testimony regarding children's expenses is sufficient evidence upon which to base an award of child support. *In re Marriage of Angell*, 328 S.W.3d 753, 760 (Mo.App.S.D. 2010). In any case, such testimony need not be proved with absolute particularity, and the trial court may, at its option, accept or reject such evidence. *Id.* While Father argues that the amount of $960 per month is incorrect, the court was permitted to accept Mother's testimony as proof of the actual monthly amount of uninsured medical expenses for B.R. and J.M.

Finally, the record shows that B.R. and J.M. frequently benefitted from out-of-network medical care and the trial court found it was no longer reasonable to require Mother to pay 75% of all out-of-network expenses per the original judgment.

Based on the foregoing, we find there is sufficient evidence to support the trial court's decision to include $960 per month for uninsured medical expenses in the PCSA. Point IV is denied.

16

V.     The trial court did not err by failing to impute income to Mother after she voluntarily reduced her income by retiring from her teaching job.

Generally, the purpose of imputing income to a party is to prevent a parent from deliberately escaping a support obligation by voluntarily refusing work or reducing his or her income or financial situation. *In re Marriage of Braun*, 887 S.W.2d 776, 779 (Mo.App.E.D. 1994). In order to avoid such a situation, a court may, in proper circumstances, impute income to a parent according to what that parent could earn by use of his or her best efforts to gain employment suitable to that parent's capabilities. *Hoffman v. Hoffman*, 423 S.W.3d 869, 877 (Mo.App.E.D. 2014). "Proper circumstances" in which imputation of income for support purposes is warranted include situations where a parent has voluntarily reduced his or her income without justification. *Id.* It is within the trial court's discretion to determine whether or not to impute income to a party and we will not reverse the court's determination absent a manifest abuse of that discretion. *Id.* at 876.

While Father argues on appeal that Mother's retirement was without justification, the record here contains ample evidence demonstrating that Mother retired from her job for the benefit of B.R. and J.M. and not to deliberately escape her child support obligation. In particular, Mother testified that her job as a full-time teacher negatively impacted the welfare of the boys—specifically, that all of the time she spent outside of school preparing lessons, grading papers, and attending meetings took away from her time at home with B.R. and J.M. These circumstances not only led to physical and verbal disagreements between her and the boys, but they also negatively affected Mother's ability to help B.R. and J.M. with their schoolwork, which was a crucial and necessary part of their success.

In addition, the record contained evidence that B.R.'s and J.M.'s extreme behavior directly impacted Mother's ability to continue her employment at Parkway. For example, Mother testified

17

that she sometimes had to leave work in the middle of teaching a lesson to pick up J.M. from school after he had had a violent outburst. Mother also explained that she took a twelve-week leave from work just prior to her retirement because the stress and anxiety of single-parenting B.R. and J.M. rendered her unable to stand in front of her classroom full of students. Despite these occurrences, Mother waited to retire from Parkway until she was eligible to receive full retirement benefits for herself and the boys.

Therefore, we find the evidence in the record is sufficient to demonstrate that Mother's retirement was not a deliberate attempt to reduce her child support obligation. Point V is denied.

VI.    The trial court did not err in awarding $25,000 in attorney's fees on appeal to Mother.

The trial court is considered an expert on the issue of attorney's fees, and thus we presume the award is valid and will only alter it upon a showing of abuse of discretion. *Abbott v. Perez*, 140 S.W.3d 283, 296 (Mo.App.E.D. 2004). When determining the award of attorney's fees, the court shall consider all factors that it deems relevant, including those identified in § 452.355.1. *See Kunce v. Kunce*, 459 S.W.3d 443, 449 (Mo.App.W.D. 2015). Here, we find the court did so.

First, the court looked at the financial resources of both Mother and Father, § 452.355.1, and concluded that Mother's income has not substantially changed since the court awarded her attorney's fees in the modification judgment. In particular, the court found that the limited additional income that Mother earns from tutoring does not rise to the level of significant increase in her income, or in her ability to pay her attorney's fees on appeal. While Father argues that his income has decreased since the modification judgment, the court found the decrease unsubstantial. Furthermore, the court considered the fact that Father has minimal monthly living expenses and credit card debt, and according to his own testimony, receives assistance from his mother for his legal fees.

18

Because a party's greater ability to pay is not dispositive, and is merely one factor among many that the trial court may consider, *Barth v. Barth*, 372 S.W.3d 496, 520 (Mo.App.W.D. 2012), the court properly considered other factors that it deemed relevant. For example, the court examined the merits of the case and the actions of the parties during the pendency of the appeal. § 452.355.1. Specifically, the court noted the fact that Father appealed essentially every aspect of the modification judgment, and considered Father's testimony that he has been paying his own attorney $4,000 every month since June of 2018 and that those payments will continue as long as his appeal is pending. In addition, the court found reasonable and credible Mother's testimony that she would likely incur $27,150 in defending Father's appeal.

While the court amended its judgment to reduce the award of attorney's fees on appeal to $25,000, we find that the court properly considered all relevant factors in making its determination. Accordingly, we find no abuse of discretion in the trial court's award of $25,000 to Mother.

### Conclusion

For the reasons set forth above, we affirm the judgment of the trial court as modified herein.

_____
James M. Dowd, Presiding Judge

Gary M. Gaertner, Jr., and
Robin Ransom, J. concur.

19